876 F.2d 308
 John J. McLAUGHLIN, Marilyn McLaughlin
v.
Irene PERNSLEY, Commissioner, City of Philadelphia,
Department of Human Services and the Reverend
Willie Williams and Elaine Williams,
Intervening Defendants,
v.
CATHOLIC SOCIAL SERVICES, Sister Marion Dillon, Jack Smith,
Robert Letulle, Christine Beahan.
Appeal of Rev. Willie WILLIAMS and Elaine Williams,
Intervening Defendants, Appellants in Nos. 88-1718
and 88-1756.
Appeal of CATHOLIC SOCIAL SERVICES, Sister Marion Dillon,
Jack Smith, Robert Letulle, Christine Beahan,
Appellants in No. 88-1737.
 Nos. 88-1718, 88-1737 and 88-1756.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 24, 1989.
Decided May 30, 1989.
 
 Robert T. Vance, Jr. (argued), Brown, Vance, Jackson & Smith, Philadelphia, for Rev. Willie Williams and Elaine Williams, appellants in Nos. 88-1718 and 88-1756.
 John P. O'Dea (argued), Stradley, Ronon, Stevens & Young, Philadelphia, for Catholic Social Services, Sister Marion Dillon, Jack Smith, Robert Letulle and Christine Beahan, appellants in No. 88-1737 and appellees in Nos. 88-1718 and 88-1756.
 Michael Churchill (argued), Public Interest Law Center of Philadelphia, Philadelphia, Pa., for John J. McLaughlin and Marilyn McLaughlin, appellees.
 Guy Vilim (argued), City of Philadelphia, Law Dept., Philadelphia, Pa., for Irene Pernsley, the City of Philadelphia and the Dept. of Human Services.
 Before SEITZ, HIGGINBOTHAM and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 This is the sad case of five-year-old Raymond Bullard. Uprooted twice in his young life, Raymond has become the unfortunate victim of litigation before several courts.
 
 
 2
 This controversy began with Raymond's removal from a foster home allegedly on the basis of race and without notice. In their complaint, the plaintiffs in this case--the foster parents from whose care Raymond was removed--claim that the child's removal violated the equal protection and due process clauses of the United States Constitution as well as Pennsylvania state law. We are faced today only with the question of the propriety of the district court's issuance of a mandatory preliminary injunction ordering Raymond's return to the care of his original foster parents. The unusual and complicated procedural posture of this case limits the issues properly before us.
 
 I. Background
 
 3
 In October 1983, when he was four months old, Raymond Bullard, a black child, was placed in foster care with the plaintiffs John and Marilyn McLaughlin, who are white. The placement was made by Catholic Social Services (CSS), a Foster Family Care Agency with which the City of Philadelphia, Department of Human Services contracts, inter alia, for the provision of foster care services. A CSS document describing Raymond's placement with the McLaughlins states "a White home had to be used because it was the only available Infant Home." Shortly after the placement, pursuant to Pennsylvania's Juvenile Act, 42 Pa.Cons.Stat.Ann. Sec. 6301, et seq. (Purdon 1982), Raymond was adjudicated a dependent child and committed to the legal custody of the City of Philadelphia, Department of Human Services, Children and Youth Agency retroactive to the date of his placement with the McLaughlins. The Department of Human Services and its commissioner (DHS or the City) are the defendants in this action. Raymond remains in the City's legal custody.
 
 
 4
 After Raymond had been with the McLaughlins for two years, a black family, intervenor defendants Rev. Willie Williams and Elaine Williams, became available as foster parents. CSS determined to remove Raymond to the foster care of the Williams family. The Department of Human Services was advised by CSS that Raymond would be removed from the McLaughlins' care and placed with the Williamses.
 
 
 5
 With certain exceptions, Pennsylvania foster care regulations give foster parents who have had actual custody of a child for a period in excess of six months the right to appeal the child's removal from their foster family. These regulations require the Foster Family Care Agency, in this case CSS, to inform foster parents in writing at least fifteen days prior to the relocation of the child of their right to appeal. If the foster parents do appeal, the regulations provide that "the child shall remain in the foster family home pending a decision on the appeal." This regulation appears at 55 Pa.Code Sec. 3700.73.[1]
 
 
 6
 At the time of its determination to transfer Raymond to the Williams home, CSS admittedly did not inform the McLaughlins of their right to appeal. Nonetheless, in October 1985, Raymond was removed from the McLaughlins' care and placed in foster care with the Williamses.
 
 
 7
 The McLaughlins filed a petition in the Family Court Division of the Court of Common Pleas of Philadelphia County seeking the return of Raymond. That court found that the Williamses could adequately provide for the foster child's needs, and denied the McLaughlins' petition. See McLaughlin v. Pernsley, 654 F.Supp. 1567, 1576 (E.D.Pa.1987). The McLaughlins filed timely exceptions to the Order of the Family Court. Thereafter, the McLaughlins and DHS agreed that DHS would be granted an indefinite extension of time to respond to the McLaughlins' exceptions to the order. The parties do not represent that there will ever be a final judgment in this matter.
 
 
 8
 The City and the McLaughlins also agreed that an independent psychiatric evaluation might obviate the need for any further litigation. Dr. Eileen Bazelon was chosen by the City of Philadelphia to evaluate Raymond from a list of psychiatrists provided by the McLaughlins' counsel. She recommended that Raymond should be returned to the McLaughlins.
 
 
 9
 When DHS did not act on Dr. Bazelon's recommendation, the McLaughlins instituted this action in the district court solely against the City. The McLaughlins' complaint contained claims under 42 U.S.C. Sec. 1983 (1982) alleging a violation of their constitutional right to equal protection of the laws, and a deprivation of their due process rights, a claim under 42 U.S.C. Sec. 1985(3) (1982) alleging a conspiracy to deprive them of their right to equal protection, and a state law claim of intentional infliction of emotional distress. The McLaughlins sought declaratory and injunctive relief and compensatory and punitive damages, as well as reasonable attorneys' fees. DHS thereafter joined CSS as a third-party defendant solely on an indemnification theory.
 
 
 10
 In an attempt to resolve this litigation, DHS and the McLaughlins agreed to a new psychiatric evaluation of Raymond by a three-psychiatrist panel. The City chose one psychiatrist, Dr. Henry Eisner, as did the McLaughlins, who chose Dr. Bazelon. These two psychiatrists chose the third member of the team, Dr. Marshall Schechter. This team conducted an extraordinarily thorough psychological examination of Raymond. After the team filed its report--which can be read to recommend returning Raymond to the care of his original foster parents--DHS reversed its position on Raymond's placement and decided to return Raymond to the McLaughlins.
 
 
 11
 By this time, however, the consequences of Raymond's original removal from the McLaughlins and placement with the Williams family could not so easily be undone. Raymond had now been with the Williamses for more than one year and eight months. Pursuant to 55 Pa.Code Sec. 3700.37, the Williamses appealed DHS's decision to relocate Raymond to the Pennsylvania Department of Public Welfare (DPW) in a proceeding to which the McLaughlins were not parties.
 
 
 12
 The Department of Public Welfare first ordered Raymond's return to the McLaughlins. On rehearing, however, DPW Secretary John White reversed this order and sustained the Williamses' relocation appeal, concluding that it was in Raymond's best interests that he remain with the Williamses. The City subsequently filed a Petition for Review in the Commonwealth Court of Pennsylvania.[2]
 
 
 13
 Meanwhile, the McLaughlins had filed in the district court a renewed Motion for a Preliminary Injunction asking that the city be ordered to return Raymond to their care. After Secretary White's decision, DHS filed its Response to this motion. Although the putative defendant, DHS did not contest the McLaughlins' motion. DHS argued in the district court that "the single issue before this Court is whether the child's best interests warrant his return to plaintiffs' foster care." DHS asked that the district court "move directly to a consideration of the child's best interests with the full participation of all appropriate persons."
 
 
 14
 The Williamses filed a motion to intervene as of right under Fed.R.Civ.P. 24(a) "to protect their interest in maintenance of their long-term foster care placement of [Raymond Bullard], which recently was affirmed by the Secretary of DPW." The district court granted in part this motion to intervene as of right, "insofar as it permits the Williams family to assist the Court in deciding whether Raymond Bullard's best interests are served by returning him to the foster care of the McLaughlins as a remedy to any constitutional violation." The motion to intervene was denied "insofar as the Williams family seeks to assist the Court in determining if constitutional violations occurred because the Williams family lacks standing to address these issues." Compare Harris v. Pernsley, 820 F.2d 592, 599 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987).
 
 
 15
 The district court held three days of hearings on the McLaughlins' motion and then examined the various factors that must be considered in deciding whether to issue a mandatory preliminary injunction. See In Re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d Cir.1982). It concluded that, in removing Raymond from the McLaughlins' care, CSS was "acting for and on behalf of the DHS," and that the removal was based, "pursuant to [DHS] policy," solely on the fact that the McLaughlins are white and Raymond black. The district court concluded therefore that the McLaughlins would likely succeed on the merits of their equal protection claim. The district court also found that the McLaughlins had been provided no notice of their right to appeal the original removal decision, and concluded that the McLaughlins would also likely succeed on the merits of their due process claim.
 
 
 16
 The district court found that the McLaughlins would suffer irreparable harm if the injunction were not granted, and that Raymond would suffer irreparable harm if he were not returned to the McLaughlins. The court recognized the harm to the Williamses from the injunction, but concluded that "the balance of equities in this case strongly favor[s] the return of Raymond to the McLaughlins."
 
 
 17
 Lastly, the district court examined the public interest, and concluded that placement solely on the basis of race, rather than on the quality of the child's relationships, could never serve the public interest.
 
 
 18
 The district court granted the plaintiffs' motion and ordered DHS to return Raymond to the foster care of the McLaughlins. The district court's order also requested that Dr. Bazelon submit a plan for the return of Raymond from the Williamses to the McLaughlins over an eight week period, 693 F.Supp. 318 (1988). Three weeks later, the district court issued a second order implementing a transition plan prepared and submitted by Dr. Bazelon pursuant to the court's original order.
 
 
 19
 We emphasize that DHS has not appealed from either order of the district court.[3] Third-party defendant CSS appealed from the injunction ordering Raymond's return to the McLaughlins in No. 88-1737. Intervenor-defendants, the Williamses, appealed from this same order in No. 88-1718, and from the order adopting the transition plan in No. 88-1756.
 
 
 20
 The transition was completed the week of October 24, 1988. Since then, Raymond has been in the foster care of the McLaughlins. The order approving the transition plan provides for Raymond to continue to visit with the Williamses one day a week.
 
 
 21
 It is against this intricate and dreary procedural background that we address the appeals before us.
 
 II. Subject Matter Jurisdiction
 
 22
 We are required at the outset to determine whether the district court possessed subject matter jurisdiction over plaintiffs' claims.
 
 
 23
 We recognize that domestic relations matters have traditionally been viewed as a limitation on the diversity jurisdiction of the federal courts. As this court held in Albanese v. Richter, 161 F.2d 688, 689 (3d Cir.), cert. denied, 332 U.S. 782, 68 S.Ct. 49, 92 L.Ed. 365 (1947), "[the diversity statute], as interpreted by the courts, has been held consistently not to include suits primarily involving domestic relations."
 
 
 24
 But this action was not brought under the diversity statute. It was commenced under 28 U.S.C. Sec. 1331 (1982).[4] While the application of the "domestic relations exception" to such a suit is an open question in some circuits, our court in Flood v. Braaten, 727 F.2d 303, 308 (3d Cir.1984), said: "[A]s a jurisdictional bar, the domestic relations exception does not apply to cases arising under the Constitution or laws of the United States." Compare Ruffalo by Ruffalo v. Civiletti, 702 F.2d 710, 717-18 (8th Cir.1983).
 
 
 25
 It is, of course, true that the Act involved in the Flood case, 28 U.S.C. Sec. 1738A (1982) (Parental Kidnapping Prevention Act), has since been construed by the Supreme Court, contrary to Flood, not to create an implied cause of action. See Thompson v. Thompson, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). Nevertheless, our court's determination in Flood with respect to subject matter jurisdiction remains unsullied because the Supreme Court in Thompson was concerned solely with the implied cause of action issue. We, therefore, conclude that the jurisdictional ruling in Flood continues to bind this court. Third Circuit Internal Operating Procedures Chapter 8.C. (Policy of Avoiding Intra-Circuit Conflict of Precedent). Thus, the district court had subject matter jurisdiction over the McLaughlins' complaint.
 
 III. Standing to Appeal
 A. The Appeal of Catholic Social Services
 
 26
 Catholic Social Services appeals from the order granting the McLaughlins' renewed motion for a preliminary injunction. We first consider the attack on the standing of CSS to appeal where, as here, it is only a third-party defendant and the injunction does not run against it.
 
 
 27
 In order to have standing to appeal a party must be aggrieved by the order of the district court from which it seeks to appeal. See, e.g., Watson v. Newark, 746 F.2d 1008 (3d Cir.1984). This requirement expresses the limitation imposed by Article III of the federal Constitution that one wishing to invoke the jurisdiction of a federal court have suffered an injury in fact. See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In order to appeal, CSS must have a "judicially cognizable interest" in the placement or custody of Raymond Bullard. E.g., Diamond v. Charles, 476 U.S. 54, 71, 106 S.Ct. 1697, 1708, 90 L.Ed.2d 48 (1986).
 
 
 28
 The City of Philadelphia, Department of Human Services--not CSS--is Raymond's legal custodian. CSS does not contend that standing is conferred by Commonwealth law. Nor does CSS argue that its contract with the municipality--not in the record before us--grants it any independent interest apart from that of the City, which has chosen not to appeal. We conclude that under the circumstances, CSS has no independent legally cognizable interest in Raymond's custody or placement while in foster care, particularly in view of the position taken by the City, Raymond's legal custodian.
 
 
 29
 CSS argues that it has standing nonetheless. It contends that its standing derives from its status as third-party defendant and from Rule 14 of the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 14(a). Rule 14 assures a third-party defendant complete defense protection in an action where it may be liable for a judgment in favor of a plaintiff and where the third-party plaintiff--in this case the City--fails or neglects to assert available defenses. See Fed.R.Civ.P. 14(a) advisory committee's note to 1946 amendment.
 
 
 30
 It is true that "[f]or the purpose of defense against plaintiff's complaint, a third-party defendant is in the law suit as an adverse party to the same extent as the defendant and must act accordingly." F & D Property Company v. Alkire, 385 F.2d 97, 100 (10th Cir.1967). However, that does not give a third-party defendant standing to appeal from an interlocutory order by which he is not aggrieved.
 
 
 31
 By its terms the preliminary injunction order of the district court does not directly or indirectly restrain CSS from the performance of any act as a third-party defendant. Neither does it finally determine the City's liability to the McLaughlins nor the liability of CSS to the City. Because the preliminary injunction does not affect any legally cognizable interest of CSS, we will dismiss this appeal of CSS for lack of standing. We would add and emphasize that we are not addressing CSS's standing in other contexts.
 
 B. The Appeals of the Williamses
 
 32
 We are next faced with the question of the Williamses' standing to appeal. "[A]n intervenor's right to continue a suit in the absence of the party on whose side the intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Article III." Diamond v. Charles, 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986). The relationship between the interests required for intervention in the district court and the interests required to confer Article III standing on appeal has not been clearly delineated. It is clear, however, that an intervenor defendant--whether permissive or as of right--will not necessarily have standing to appeal. See, e.g., id. at 68-69, 106 S.Ct. at 1706-07 ("The interests [appellant] asserted in the district court in seeking to intervene plainly are insufficient to confer standing on him to continue this suit now.").
 
 
 33
 We must therefore satisfy ourselves that the Williamses have suffered the requisite injury in fact to meet the requirements of standing. See Norman's on the Waterfront v. Wheatley, 444 F.2d 1011 (3d Cir.1971) (standing of intervenor to appeal). Without difficulty, we conclude that the interest of these foster parents of several years in preventing the removal of Raymond from their home is sufficient to confer standing on appeal, particularly since the transfer to their foster care was with the tacit approval of the City. Cf., Smith v. Organization of Foster Families for Equality and Reform (OFFER), 431 U.S. 816, 841 n. 44, 97 S.Ct. 2094, 2108 n. 44, 53 L.Ed.2d 14 (1977) ("No party denies, or could deny, that there is an Article III 'case or controversy' between the foster parents and the defendant state officials concerning the validity of the removal procedures.")[5]
 
 IV. Preliminary Injunction
 
 34
 We turn therefore to the Williamses' sole contention on this appeal that the district court erred in granting the mandatory preliminary injunction returning Raymond to the McLaughlins' care. Ordinarily, we would address each of the several factors employed in resolving an appeal from such an order, i.e., 1) the probability of success in the litigation, 2) irreparable injury to the movant pendente lite if relief is not granted, 3) the possibility of harm to other interested persons from the grant or denial of the injunction and 4) the public interest. See In Re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1143 (3d Cir.1982). Here, however, we deal with an unusual situation.
 
 
 35
 Although we understand the district court to have granted the Williamses' motion to intervene as of right, it is clear that it was permitted only insofar as it related to remedy. The Williamses may appeal "only to the extent of the interest that made it possible for them to intervene," C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 1923, p. 517 (2d ed.1986).[6] Indeed, the only aspect of the decision of the district court from which the Williamses do appeal is that which relates to remedy. Their counsel made that explicitly clear at oral argument. Thus, we are not called upon to consider an attack on the district court's finding that it is probable that the McLaughlins will succeed on the merits of their constitutional claims. We therefore will turn to the remaining factors.
 
 
 36
 In reviewing this grant of a preliminary injunction, we must determine only whether the district court abused its discretion, made an error of law, or made a serious mistake in the consideration of the proof in issuing the injunction. "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." International Union, UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (3d Cir.1987).
 
 A. Irreparable Harm to the McLaughlins
 
 37
 We first address the district court's conclusion that the McLaughlins will suffer irreparable harm without the injunction. The Williamses challenge the district court's finding that as time passes the possibility of Raymond's return to the McLaughlins will become more remote. The Williamses also argue that the McLaughlins' injury is merely a consequence of the previous removal of Raymond from their care, and is not an injury that will befall the McLaughlins pendente lite absent injunctive relief.
 
 
 38
 The psychiatric evidence presented to the district court suggests that the bonds between a child and a parent from whom he has been separated weaken with the passage of time. There was no disagreement that strong attachments had formed and still exist between Raymond and the McLaughlins. This was the conclusion of the three-psychiatrist team that undertook the most complete examination of the child, and was reiterated by the two members of that panel who testified before the district court, Drs. Bazelon and Schechter. Raymond's treating psychiatrist, Dr. Gregory Williams, also testified before the district court that Raymond still has ties to the McLaughlins. Dr. Williams' testimony is particularly relevant. He was selected by Catholic Social Services to be Raymond's psychiatrist. At the time of his testimony, Dr. Williams had been seeing Raymond once a week for more than eight months. We conclude that the findings of fact upon which the district court based its conclusion of irreparable harm were not clearly erroneous.
 
 
 39
 Because we find no error in the determination of the district court that the bonds between the McLaughlins and their foster child will weaken continuously with the passage of time apart, we conclude that the McLaughlins' interest in the continuation of that relationship will be irreparably injured in the absence of interim injunctive relief. Such injury is, of course, cognizable where, as here, the foster child has been removed from the foster parents' care in violation of the state's prescribed procedures. We do not find an error of law in the district court's conclusion that the McLaughlins will suffer irreparable harm if Raymond is not returned to them.
 
 
 40
 B. Harm to Others from the Grant or Denial of the Injunction
 
 1. Raymond
 
 41
 We examine next the potential harm to others from the grant or denial of the preliminary injunction. Of course the effect of the injunction will be most heavily felt by Raymond himself. We find ourselves therefore in the unenviable position of reviewing the district court's determination as to what is in the "best interests" of this child.
 
 
 42
 The Williamses argue that the district court's finding that there would be irreparable harm to Raymond absent a grant of the preliminary injunction was clearly erroneous.[7] Indeed, they argue affirmatively that Raymond will suffer irreparable harm if he is removed from their home.
 
 
 43
 Although Raymond had seen at least one psychologist previously, Dr. Bazelon was the first psychologist or psychiatrist to examine Raymond with both families. She initially evaluated Raymond after he had been living with the Williamses for more than a year. She observed a radical change in Raymond when he was reunited with the McLaughlins. She has testified that "[i]t was as if someone had turned on a light switch and a light had come on inside him."
 
 
 44
 Dr. Bazelon concluded in her report that "Raymond Bullard has suffered a clinical depression of childhood since leaving the McLaughlins," and observed a delay in Raymond's speech development. She found that "the childhood depression he is now experiencing ... has significantly interfered with his current functioning and level of achievement." She expressed her professional opinion that Raymond should be returned to the McLaughlins, stating that "I think his depression will clear and his language development will return to normal if he is reunited with them. He has great potential for recovery, and the remedy for his depression is self evident. If he is not returned, I think he will continue to be clinically depressed and speech will continue to be delayed. He may well become the passive, obedient pleasant child that he is as a pre-schooler who never realizes his full potential emotionally or intellectually."
 
 
 45
 Dr. Bazelon did not disparage the Williamses' performance as foster parents. Her report stated: "They impress me as kind, loving, well-intentioned people who care for Raymond, but who are not his primary attachment objects because he has formed a lasting bond with the McLaughlins."
 
 
 46
 Raymond was also evaluated by the three-psychiatrist team. The team was given by the parties a list of questions to be addressed. In addition, they were requested that "[i]f you conclude that it will make no significant difference to Raymond's emotional, psychological, psychiatric or developmental status which family he lives with, please state and explain this conclusion, as the parties have agreed that Raymond will return to the McLaughlins in this case. (This agreement exists solely for the purposes of resolving the litigation and for no other reason. The team should not interpret the agreement in any way as a lessening of the opinion by those involved in the matter who believe that Raymond should remain with the Williams.)"[8]
 
 
 47
 This team conducted an extremely extensive evaluation of Raymond's situation over a period of almost two months. There is some ambiguity in the team's ultimate conclusion. The team report stated "[i]f there is still depression there, and we believe there are at least residues of it as borne out in the testing, and if it is due to the separation from the McLaughlins as we believe, we feel it would be worthwhile to return Raymond to the McLaughlins. Two of the evaluation team members were uncertain about this, the third felt that this was only fair to Raymond.... Because the members of the team could not be sure to which family Raymond should be permanently placed, by prior agreement Raymond is to be returned to the McLaughlins."
 
 
 48
 More recently, Dr. Williams, Raymond's treating psychiatrist, has diagnosed Raymond as having a "prolonged adjustment disorder with depressed mood," that is, he agrees that Raymond is depressed. In his district court testimony, Dr. Williams attributed the delay in Raymond's speech development to emotional problems, while he also acknowledged that there might be some organic contribution. Dr. Williams testified in the district court that he does not consider himself an expert on child placement. He has testified that he was not and is not able to make a recommendation as to Raymond's placement.
 
 
 49
 Because of the importance of stability to the development of a child, the medical evidence before the district court uniformly recognized that there is some risk involved in removing Raymond from the Williamses' care and disrupting his life. There was also evidence that Raymond has shown some developmental progress while under the Williamses' care. Necessarily, important bonds have formed between Raymond and the Williamses.
 
 
 50
 In addition, there was some evidence--the report of a child psychiatrist, Dr. Lydia Linan, and a second year psychiatry fellow, Dr. Richard Smith--that suggested Raymond was not depressed. This report was based on three hours of observation of Raymond two months before Drs. Eisner, Bazelon and Schechter began their team evaluation of Raymond. The report by Drs. Linan and Smith also suggests that Raymond's speech problem pre-dates his removal from the McLaughlins' care.
 
 
 51
 However, after reviewing all the medical evidence, we do not believe that the district court's finding that Raymond will suffer irreparable harm if he is not returned to the McLaughlins was clearly erroneous. The evidence supports a conclusion that a return to the McLaughlins will offer Raymond the best hope of realizing his full potential. Our review of the evidence does not persuade us that the district court was in error when it concluded that such a return is in Raymond's best interests. Given the subject matter, however, we recognize the fallibility of any conclusion in this area.
 
 
 52
 The Williamses argue that the medical testimony of Drs. Bazelon and Schechter was tainted by a "psychological bonding presumption." See In re Donna W., 325 Pa.Super. 39, 472 A.2d 635, 644-45 (1984). In the Williamses' view, the district court erred as a matter of law by adopting the view allegedly held by these witnesses that the original parental bond is always the most important one. After a review of all the testimony, we conclude that there is no basis in the record for the Williamses' argument that Drs. Bazelon and Schechter hold such a view. Their testimony does not reflect such a presumption. Consequently, we find no abuse of discretion in the district court's reliance on the testimony of these doctors.
 
 2. The Williamses
 
 53
 As the district court recognized, there will necessarily be harm to the Williamses from a grant of the injunction and Raymond's return to the McLaughlins. We agree with the district court's observation that the Williamses' needs "must be balanced against those of Raymond and the McLaughlins." The evidence before the district court uniformly suggests that the Williamses have been superb foster parents to Raymond. They, too, have been victims of the City's questionable judgment in the exercise of its legal custody over Raymond. Given our conclusions concerning the district court's findings of irreparable harm to the McLaughlins and, more importantly, to Raymond, however, we conclude that it was not an abuse of discretion for the district court to strike the balance where it did, in favor of the return of Raymond to the McLaughlins.
 
 C. The Public Interest
 
 54
 Lastly, the Williamses contend that the public interest in remedying the violation of the McLaughlins' constitutional rights does not require Raymond's return. They argue that the payment of money damages would serve the public interest better than a "premature change in [Raymond's] foster care."
 
 
 55
 This argument, in essence that the burden of racial justice ought not to be borne on a child's back, is premised on a view that the return of Raymond to the McLaughlins is not in the child's best interests. Because we do not feel free on this record to disagree with the district court's determination to the contrary, we find no error in the district court's analysis of the public interest.
 
 
 56
 The order of the district court granting the preliminary injunction will therefore be affirmed.
 
 V. The Transition Plan
 
 57
 The Williamses also challenge the transition plan approved by the district court. They argue that a hearing should have been held before the plan was approved. We believe that, particularly in light of the evidence already placed before the court in the hearing on the preliminary injunction, the district court's decision to approve the plan without a hearing was not an abuse of discretion.
 
 
 58
 The Williamses also rely on the same "psychological bonding presumption" argument that they made in their appeal from the order issuing the injunction. Our conclusion on that issue above disposes of their contention here. The order approving the plan for Raymond Bullard's transition to the McLaughlins' care will be affirmed.
 
 VI. Conclusion
 
 59
 We emphasize that this is not an immutable, final child custody decision either by us or by the district court. Such matters are ultimately within the jurisdiction of the states. All we hold today is that, given the preliminary nature of this appeal, the legal and factual issues properly before us, as well as the unchallenged finding of the district court that it is likely that the McLaughlins will succeed on their constitutional claims, the injunctive remedy ordered by the district court did not constitute an abuse of discretion despite its mandatory character.
 
 
 60
 The appeal in No. 88-1737 will be dismissed. In Nos. 88-1718 and 88-1756, the orders of the district court will be affirmed without costs.
 
 
 
 [1]
 Under the regulations, a foster parent's appeal is heard in the first instance by the Commonwealth of Pennsylvania Department of Public Welfare's Office of Hearings and Appeals. See 55 Pa.Code Sec. 3700.73(d). Thereafter, judicial review is available in the Pennsylvania Commonwealth Court, see 2 Pa.Cons.Stat.Ann. Sec. 702 (Purdon Supp.1988): 42 Pa.Cons.Stat.Ann. Sec. 763 (Purdon 1981), and then, if allowed, in the Pennsylvania Supreme Court. See 42 Pa.Cons.Stat.Ann. 724 (Purdon 1981)
 
 
 [2]
 We take judicial notice that this case was recently withdrawn and dismissed by the clerk of the Commonwealth Court at the request of the City
 
 
 [3]
 In each appeal from the district court's original order (Nos. 88-1718 and 88-1737), however, the City has filed a brief styled "Brief for City Appellees." Since no one has challenged this procedure, we have no occasion to address its propriety
 
 
 [4]
 Plaintiffs also rely for jurisdiction on 28 U.S.C. Secs. 1343(1) and 1343(3) (1982). Section 1343(1) applies only to damages actions and is not relevant to the plaintiff's claim for injunctive relief. The elimination of the jurisdictional amount requirement under Section 1331 in 1980 "has rendered Sec. 1343(3) superfluous." P. Bator, D. Meltzer, P. Mishkin, D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1241 (3d ed. 1988)
 
 
 [5]
 Neither the City nor any other party has urged in this appeal that the district court should have abstained, e.g., under the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Because abstention is not jurisdictional but implicates the exercise of equitable powers, see Ohio Civil Rights Commission v. Dayton Christian Schools, Inc., 477 U.S. 619, 626, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986), and because abstention would raise the possibility that this five year old child would unnecessarily be exposed to yet another custody transfer before custody is finally determined, we decline to decide the abstention issue on our own motion. Compare Brown v. Hotel Employees, 468 U.S. 491, 500 n. 9, 104 S.Ct. 3179, 3184 n. 9, 82 L.Ed.2d 373 (1984). We recognize that the district court, at an earlier stage of this litigation, issued an opinion with an accompanying order denying the City's motion to dismiss in favor of the McLaughlins' original action before the Family Court on Younger abstention grounds. See McLaughlin v. Pernsley, 654 F.Supp. 1567 (E.D.Pa.1987). The correctness of this abstention decision of the district court can presumably be raised on an appeal from the final judgment
 
 
 [6]
 We do not have before us, on this appeal, any challenge to the correctness of the district court's action in granting only limited intervention
 
 
 [7]
 The Williamses also argue that the decision of Department of Public Welfare Secretary White has preclusive effect on our consideration of the issue of Raymond's best interests. The McLaughlins were not parties to the action before the Department of Public Welfare. Although DHS took the position in the DPW proceedings that Raymond should be returned to the McLaughlins, the interests of DHS and the McLaughlins are in many respects in fundamental conflict. The McLaughlins cannot therefore be said to have been fairly represented by DHS. We conclude that the McLaughlins were not in privity with DHS, and that the decision of Secretary White has no preclusive effect on the propriety of the preliminary injunction in this case
 
 
 [8]
 We disagree with the Williamses' contention that this agreement between DHS and the McLaughlins tainted the report of the three-psychiatrist panel or the testimony of Drs. Bazelon and Schechter. We do not believe the district court abused its discretion in relying on that testimony