**Brenda EVANS, et al., Plaintiffs,**

v.

**Madeline BUCHANAN, et al., Defendants.**

**Civ. A. No. 1816–1822 MMS.**

United States District Court, D. Delaware.

April 12, 1990.

Irving Morris, and Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del. (William L. Taylor, Washington, D.C., and Leonard L. Williams, Wilmington, Del., of counsel), for plaintiffs.

Bertram S. Halberstadt, of Wier & Halberstadt, Wilmington, Del., for intervening hispanic plaintiffs.

David H. Williams, and Barbara D. Crowell, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant Brandywine School Dist.

Mason E. Turner, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, and Marcia Rees, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant State Bd. of Educ.

Raymond E. Tomasetti, Jr., and Melanie M. Buchanan, of Goll & Tomasetti, Newport, Del., for proposed interveners.

OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This is the most recent proceeding in lengthy desegregation litigation that traces

---

**4.** *See supra* note 2 (discussing the requirements of Rule 4).

its origins to the landmark decisions of the United States Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*).[1] In the mid–1970's, a three-judge court determined that the Wilmington schools, which had been *de jure* black schools prior to *Brown I,* continued to be racially identifiable and that Wilmington's dual school system had not been eliminated. *Evans v. Buchanan,* 379 F.Supp. 1218, 1223 (D.Del.1974). In a subsequent opinion, the three-judge court found inter-district *de jure* segregation involving the school districts in northern New Castle County. *Evans v. Buchanan,* 393 F.Supp. 428, 438 (D.Del.), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). After three weeks of evidentiary hearings, the three-judge court rejected remedial plans proposed by the parties and ordered the schools in the segregated districts to be desegregated and reorganized. The responsibility of implementing the court's order was given to the State authorities. *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del. 1976), *aff'd,* 555 F.2d 373 (3d Cir.), *cert. denied,* 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

Upon the State's failure to submit a plan that would effectively eliminate the dual school system and the vestiges of *de jure* segregation, this Court entered an order consolidating the affected school districts into a single district ("1978 order"). The 1978 order addressed pupil assignment by requiring all students to attend schools in the former predominantly white districts for nine years and schools in the former predominantly black districts (the "City schools") for a minimum of three consecutive years (the "9–3 requirement"). Finally, the 1978 order required that a full 1–12 grade span be maintained within the City of Wilmington (the "City") and that at least one of the three former predominantly black high schools be used as a 10–12 grade center. *Evans v. Buchanan,* 447 F.Supp. 982 (D.Del.), *aff'd,* 582 F.2d 750 (3rd Cir.1978), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).

In 1981, after the Delaware General Assembly passed legislation empowering the Delaware State Board of Education ("State Board") to ensure compliance with the parameters set forth in the 1978 order, this Court approved division of the single consolidated district into four component school districts. *Evans v. Buchanan,* 512 F.Supp. 839 (D.Del.1981). The Brandywine School District (the "District"), one of the component districts created in 1981, has filed a "Motion for Authorization to Deviate from Previous Court Orders" (Dkt. 1231) ("Motion to Deviate"), seeking the Court's permission to deviate from the parameters of the 1978 order.[2] The District has been joined in its Motion by State Board. The representative of the black plaintiff class in this action has indicated that it will not oppose the District's motion, as have the intervening Hispanic plaintiffs.

Juanita Baughn, a black parent who lives in the District and is a member of the black plaintiff class in this litigation, has moved to intervene in the litigation to oppose the District's Motion to Deviate. For the reasons stated herein, Ms. Baughn's Motion to Intervene will be denied.

THE MOTION TO DEVIATE

The Motion to Deviate arises from the District's plan to reassign approximately 1294 students, or about 12% of the District's student population (the "Plan"). Motion to Deviate ¶ 9(e) at 6. The Plan involves the Claymont feeder pattern—one of four student assignment patterns in the District. In response to an inquiry from the State Board, the District noted that two of the schools in the Claymont feeder pat-

---

1. The history of this litigation prior to 1974 is discussed in *Evans v. Buchanan,* 379 F.Supp. 1218, 1220–21 (D.Del.1974).

2. This is not the first time that one of the four component districts has sought permission to deviate from the Court's prior order. In 1986 the Red Clay Consolidated School District sought and received permission to implement a student reassignment plan that would result in a one-time deviation from the 9–3 requirement. The Red Clay District's motion was unopposed. Motion and Order, *Evans v. Buchanan,* C.A. Nos. 1816–1822 (June 18, 1986) (Dkt. 1181).

tern, Burnett School and Claymont High School, are approaching racial identifiability. Motion to Deviate ¶ 1 at 1–2, ¶ 5 at 3, & Exh. A; *see also* Transcript, Hearing on Motion to Intervene at 31–32 (April 2, 1990) (Dkt. 1249) (hereinafter "Transcript at ___").

Although the District had previously remedied racial imbalances in its schools by piecemeal reassignment among the feeder patterns, *see* Motion to Deviate Exh. B, such reassignment is difficult due to a difference in grade configuration between the Claymont and the other feeder patterns. Whereas students in the other Brandywine District feeder patterns attend school in the City for grades 4–6, those in the Claymont pattern attend a City school (Burnett) for grades 6–8. The District asserts that this difference in grade configuration coupled with the Court's 9–3 requirement restricts the piecemeal reassignment necessary to achieve racial balance and relieve under- and over-crowding at various schools. Motion to Deviate ¶¶ 3–5 at 2–3. The District further contends that the limited reassignment which can be accomplished given the current assignment patterns is inadequate to correct the trend toward racial identifiability at some its schools, most notably Claymont High School and Burnett. Motion to Deviate ¶ 5 at 3.

In response to this problem and other educational concerns, the District formulated a reassignment Plan which would bring the Claymont feeder pattern into conformity with the grade configurations of the rest of the District. The Plan in part calls for converting the Burnett School from a 6–8 grade center to a 4–6 grade center. It also calls for closing Claymont High School and distributing its students among the remaining three high schools in the District. Motion to Deviate ¶ 8(f) at 5. The District indicated that the following benefits would flow from its Plan:

a. Establishment of three District high schools with student enrollments between 900 and 1200 would permit offering a broad, comprehensive educational program to all high school students.

b. Racial balance at each District school would be within 5% of the District racial averages for the applicable grade levels. . . .

c. A consistent organization plan throughout the District would allow better program coordination among the schools at each grade level and more flexibility in assigning students to better match a school's student enrollment with that school's physical capacity and to adjust for any future racial imbalances.

d. Changing Burnett from grades 7–8 to grades 4–6 would permit the conversion of junior high school facilities such as shop, home economics room, and science labs into classrooms, thereby increasing the number of students which the District can house in a City school.

e. The Plan calls for moving about 1294 students (or approximately 12% of the student population) to a school they would not otherwise attend if the present assignment plan remained in effect. Other alternative assignment plans which were considered would involve the movement of at least approximately twice as many students.

Motion to Deviate ¶ 9(a)–(e) at 5–6.

In order to implement the Plan, the District must receive permission from both the State Board and this Court because implementation of the Plan would result in two deviations from the parameters set by this Court in its 1978 order:

(i) The conversion of Burnett from grades 7–8 to grades 4–6 would result in a one-time deviation from the Court's 9–3 requirement with approximately 637 students attending a City school for less than 3 years. *See* Motion to Deviate ¶ 17 at 9.

(ii) Brandywine School District is the only one of the four districts which currently operates grades 7–8 in the City. Unless another district chooses to maintain those grades in the City, the conversion of Burnett would result in a deviation from the 1978 order's requirement that the full 1–12 grade span be maintained in the City. *See* Motion to Deviate ¶ 15 at 8.

The State Board granted its permission for the District to proceed with the Plan and joined the District's Motion to Deviate. Resolution of the State Board of Education (Dec. 12, 1989) (attached as Exh. D of the Motion to Deviate). The Coalition to Save Our Children (the "Coalition"), representative of the black plaintiff class in this litigation, agreed not to oppose the District's Plan in exchange for certain concessions from the District.[3] The intervening Hispanic plaintiffs have indicated that they also will not oppose the Plan. Motion to Deviate ¶ 20 at 10.

## THE MOTION TO INTERVENE

Juanita Baughn ("Proposed Intervenor"), a black parent who resides in the District and is a member of the black plaintiff class in this case, has moved on her own behalf, as parent and guardian of her son Kitwan Baughn, and on behalf of others "similarly situated" to intervene in this lawsuit to oppose the District's Motion to Deviate. She seeks intervention of right pursuant to Fed.R.Civ.P. 24(a)(2) or in the alternative permissive intervention under Rule 24(b)(2). The District, the State Board and the Coalition have filed briefs opposing Ms. Baughn's Motion to Intervene.

*Intervention of Right Under Rule 24(a)(2)*

Rule 24(a)(2) provides:

Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

■ There are then four requirements for intervention of right: (1) a timely application; (2) an interest in the subject matter of the proceedings; (3) which interest may be impaired by disposition of the action; and (4) which interest is not adequately represented by the existing parties. None of the parties opposing Ms. Baughn's Motion to Intervene have argued that her motion is untimely, and it will therefore be considered as timely filed. The focus will be on the remaining requirements for intervention.

**3.** Specifically, the District agreed to the following in exchange for the Coalition's agreement not to oppose to the Plan:

1. The District has established a goal to have a black/white team of administrators in schools that qualify for more than one administrator.

2. In an effort to improve minority hiring at all levels, the District in conjunction with the Coalition will establish an affirmative action committee. *The committee's efforts will be ongoing.* In addition, the District will continue with its present minority recruitment and promotional practices.

3. The District has invited the Coalition to send a representative on recruitment efforts. Mr. Guyzeleous Molock has agreed to serve in this capacity for the Coalition.

4. The District is committed to reducing the number of Black students suspended and arrested. Preventive efforts will continue with a special staff person assigned to assist principals and develop coping skills program in schools and in the City. In addition, the District will establish monitoring efforts.

5. The District will have a policy in the *student codes which will allow* primary school students to be suspended only as a last resort and only with the approval of the Director of Elementary Education.

6. The District will continue efforts to increase the number of Black graduates attending college.

7. The District will continue efforts to increase the number of Black students in academically gifted programs.

8. The District will continue its "children at-risk project" with efforts to strengthen relationships between schools and the parents of "at risk children."

9. The District will continue efforts to involve City parents in school matters. Activities for parents will be held in the City and transportation will be provided to City parents for activities in suburban schools.

10. The District's representative to the State Testing Committee will continue to advocate for changing standardized testing procedures.

11. In regard to Special Education, several items of concern have been agreed upon.... Letter from Jea P. Street, Chairman, Coalition to Save Our Children to Dr. Frank Furgele, Superintendent, Brandywine School District (December 20, 1989) (attached as Exh. A to Plaintiffs' Answering Brief in Opposition to the Motion to Intervene (Dkt. 1243)) (hereinafter "Street Letter").

When a parent or parent group seeks to intervene in a desegregation case:

> "[T]he important constitutional rights at stake demand a scrupulous regard for due process considerations." ... [A] petition for intervention in a school desegregation case should bring to the district court's attention the precise issues that the putative intervenors seek to represent, and the manner in which the challenged plan fails to realize the goal of a unitary system. The court must then determine the extent to which these issues have already been raised and resolved, and the extent to which such issues are known to the court and the original parties. If the court finds that the issues have been resolved, or that the current parties are aware of and competent to represent the interests of the putative intervenors, denial of intervention is proper. On the other hand, if the Court determines that the petitioner has a significant claim that it can best represent, intervention should be granted.

*United States v. CRUCIAL,* 722 F.2d 1182, 1190 (5th Cir.1983) (citations omitted).

The Court must first consider whether the Proposed Intervenor has alleged a sufficient interest in the subject of this litigation. Ms. Baughn has set forth various characterizations of her alleged interest in this litigation and the issues she seeks to raise before the Court in her "Proposed Interveners' Pleading in Support of It's [sic] Motion to Intervene Pursuant to Fed. R.Civ.P. 24(c)" (Dkt. 1241) (hereinafter "Rule 24(c) Pleading"), her Opening Brief (Dkt. 1242) and her Reply Brief (Dkt. 1247).

Proposed Intervenor resides at Naamans Apartments, Naamans Road in Claymont, Delaware.[4] Rule 24(c) Pleading at ¶ 3.

Her son is currently an eighth grade student attending Burnett School in the City. Affidavit of Dr. Frank J. Furgele, Superintendent, Brandywine School District, at ¶ 3 (Dkt. 1246). Ms. Baughn alleges that she has an interest in the subject of this litigation because she resides in an "area[ ] encompassed by the Claymont feeder pattern and ... will be directly affected by the changes contemplated by the Plan. Specifically, Kitwan Baughn and other minority children residing in the Claymont feeder pattern are those whom the Plan propose be shifted throughout the schools in the District." Rule 24(c) Pleading at ¶ 7. In her papers and at oral argument, Proposed Intervenor asserted numerous issues that she sought to bring to the Court's attention. Essentially, however, the issues Proposed Intervenor wishes to raise can be summarized as follows:

> (i) That the Plan disproportionately burdens black students because it fails to address the disproportionate suspension rates of black students at various schools in the District; and

> (ii) That the Plan fails to move toward a unitary school system because it sets a precedent for deviation from the 1978 order which will eventually result in the dismantling of the City schools and it amounts to an attempt to impose a system of racial quotas upon the schools.

■ Although it has never precisely defined the interest that a party seeking to intervene of right must allege, the United States Supreme Court has stated that intervention requires a "significantly protectable interest." *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971).[5] It is generally ac-

---

**4.** In her papers, Proposed Intervenor sought to raise the concerns of parents and students living in Stoneybrook. Since Ms. Baughn does not herself live in Stoneybrook and there has been no request by Proposed Intervenor for class certification, she has no standing to raise the concerns of the Stoneybrook residents.

**5.** The parties opposing the Motion to Intervene have questioned whether Proposed Intervenor needs Article III standing to intervene of right in this litigation. The United States Supreme Court has never decided whether a party seek-

ing to intervene of right under Rule 24(a)(2) must also satisfy the standing requirements of Article III. *Diamond v. Charles,* 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986). Various Circuit Courts of Appeals have addressed the issue, but no consensus has emerged. *See, e.g., United States v. 36.96 Acres of Land,* 754 F.2d 855, 859 (7th Cir.1985), *cert. denied sub nom. Save the Dunes Council, Inc. v. United States,* 476 U.S. 1108, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986) (interest necessary for intervention is greater than that required for standing under the APA); *SCLC v. Kelley,* 747 F.2d 777, 779

cepted that parents seeking to intervene in desegregation litigation have an interest in eliminating segregation in their children's schools sufficient. to satisfy the interest requirement of Rule 24(a)(2). *E.g., Bradley v. Milliken,* 828 F.2d 1186, 1192 (6th Cir.1987); *Morgan v. McDonough,* 726 F.2d 11, 13 (1st Cir.1984); *Pate v. Dade County School Bd.,* 588 F.2d 501, 503 (5th Cir.), *cert. denied sub nom. Beckford v. Dade County School Bd.,* 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979).

This case, however, has advanced far into the remedial stage. The secondary remedial order went into effect over eleven years ago. The only issue remaining before the Court is continued compliance by the four school districts with the parameters of the 1978 order. The particular proceeding presently before the Court involves only one of the four component school districts. Furthermore, the Brandywine District's entire reassignment Plan is not before the Court. The Court has jurisdiction only over those aspects of the Plan that would result in deviation from the parameters of the 1978 order. Given the limited scope of the current proceedings, Ms. Baughn has not alleged a sufficient interest "relating to the ... transaction which is the subject of the action" to satisfy Rule 24(a)(2).

The only part of the District's Plan before the Court in the Motion to Deviate is changing the grade structure at Burnett from grades 6–8 to grades 4–6. Proposed Intervenor's son is currently an eighth grade student at Burnett. There is no reason to believe that he will not continue on to the ninth grade in September. Transcript at 6 & 35. He will no longer be attending Burnett in September 1990 when the Plan is scheduled to be implemented.

Thus, he would not be affected by the change in grade structure at Burnett, and therefore, Proposed Intervenor has no interest in the conversion of Burnett.

The closing of Claymont High School—which Kitwan Baughn would attend absent implementation of the Plan—is not before the Court because it does not deviate from the parameters of the 1978 order. Proposed Intervenor attempted to assert at oral argument that the closing of Claymont High School was inextricably linked to the conversion of Burnett. That is not the case. Although both actions were presented as part of a single plan, the District gave reasons for closing Claymont High School that were independent of those behind its decision to change the grade structure at Burnett. For example, the District stated that declining high school enrollment prevented it from offering a comprehensive program at all four currently operating high schools. Motion to Deviate ¶ 7 at 3. Significantly, the attorney for the District indicated at oral argument that Claymont High School would be closed regardless of whether the Court grants permission for the conversion of Burnett. Transcript at 40. Proposed Intervenor simply does not have an interest in the only transaction which is the subject of the proceeding before the Court, namely the changing of the grade structure at Burnett.

Proposed Intervenor additionally fails to satisfy the requirements of Rule 24(a)(2) because—even assuming she has articulated a sufficient interest in the litigation—she has failed to raise any issue that is not adequately addressed and represented by the parties already in the litigation. "[I]nadequacy of representation is or may be shown by proof of collusion between the

(D.C.Cir.1984) (interest necessary for intervention is the same as the interest required for standing).

The Third Circuit Court of Appeals has not addressed the issue of whether plaintiff-intervenors must possess Article III standing. *McLaughlin v. Pernsley,* 876 F.2d 308, 314 (3rd Cir.1989) (addressing standing of defendant-intervenor to appeal). This Court has held that "[a]n intervenor need not have standing necessary to have initiated the lawsuit." *Indian River*

*Recovery Co. v. The China,* 108 F.R.D. 383, 386–87 (D.Del.1985); *see also Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.,* 696 F.Supp. 57, 93 (D.Del.1988) ("The fact that the plaintiffs lack standing, however, does not control the analysis of whether they are entitled to intervene."). The parties opposing the Motion to Intervene in this case have not set forth any reason which would justify departure from the precedent in this District.

representative and an opposing party, by the representative having or representing an interest adverse to the intervener, or by the failure of the representative in the fulfillment of his duty." *Pierson v. United States,* 71 F.R.D. 75, 79 (D.Del.1976) (quoting *Stadin v. Union Electric Co.,* 309 F.2d 912, 919 (8th Cir.1962), *cert. denied,* 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415 (1963)). Proposed Intervenor's counsel conceded at oral argument that she is not alleging collusion between the Coalition and the District. Transcript at 5. Furthermore, Ms. Baughn's interest in seeing the vestiges of *de jure* segregation eliminated from the schools in Northern New Castle County is identical—not adverse—to the interest pursued by the Coalition as representative of the black plaintiff class of which she is a member. Apparently, then, Proposed Intervenor alleges that by not opposing the Plan, the Coalition has failed in its duty.

Proposed Intervenor essentially raises two broad issues she claims are not adequately represented by the Coalition. The first is that the Plan disproportionately burdens black students by sending them to schools that have high suspension rates for black students. The Coalition addressed this concern in its negotiations with the District. In fact, one of the concessions it demanded from the District in return for not opposing the Plan was that the District take steps to resolve the problem of sus-

pensions. See Street Letter, *supra* note 3. Proposed Intervenor claims the action by the Coalition is not enough. She terms the agreement between the Coalition and the District "merely words on paper," Opening Brief at 11 (Dkt. 1242), and through counsel further elaborated at oral argument:

> [I]t sounds good as to what they are saying on paper, but there is no resolution of it—they are going to take steps to do something, they are going to take steps to do something else, but they are not resolving it on the other hand.
>
> And I am saying I don't think they are really addressing issues. Maybe they are addressing it to say, yes, the problem exists, but they are not resolving the problem or not taking steps to resolve it.

Transcript at 27. Both Proposed Intervenor and the Coalition agree on the need to resolve the problem of suspensions at certain schools; they differ merely on the best course of action, i.e., how to achieve a solution.

The second issue raised by Proposed Intervenor is her allegation that the Plan will not facilitate progress toward a unitary school system. She alleges that the Coalition's failure to oppose the Plan demonstrates its failure to adequately represent her interests. The interest alleged by Proposed Intervenor here is an interest in assuring the District continues its efforts to achieve a unitary school system.[6] This is

---

**6.** Subsumed in the question of whether the Plan will lead to a unitary system are two issues raised by Proposed Intervenor: (1) that allowing the District to deviate from the 1978 order by implementing the Plan sets a precedent that will result in the eventual dismantling of the City schools; and (2) that the correction of racial imbalances under the Plan is really imposition of racial quotas. In order to determine whether Ms. Baughn should be allowed to intervene, the Court must "determine the extent to which these issues have already been raised and resolved, and the extent to which such issues are known to the court and the original parties." *United States v. CRUCIAL,* 722 F.2d 1182, 1190 (5th Cir.1983). The Court will therefore briefly address the two issues raised by Proposed Intervenor here.

The parties and this Court are well aware of the potential precedential effect of implementing the Plan. For instance, in its resolution approving the Plan, the State Board stated:

"[T]his action does not have any value as a precedent for similar requests for exceptions by other school districts or by the Brandywine School District for other actions...." Resolution of the Delaware State Board of Education (December 12, 1989) (attached as Exh. D of the Motion to Deviate). *See also* Street Letter (attached as Exh. A to the Plaintiffs' Answering Brief (Dkt. 1243) ("[T]he Coalition will not oppose the ... Plan ... with the understanding ... that the Plan will not be used in the future as a precedent...."). Although this language may not necessarily prevent the perception of the Plan as precedent for future deviations, the parties and the Court are aware of this concern.

As to Proposed Intervenor's allegations that implementation of the plan would result in the imposition of racial quotas in violation of Supreme Court precedent as well as the law of this case, Proposed Intervenor has misstated the situation. The Supreme Court has prohibited only the use of ratios as a rigid and inflexible re-

the same interest that the Coalition has pursued and continues to pursue through its participation in this litigation. The Coalition's decision not to oppose the Motion to Deviate was clearly a strategic choice. In return for its agreement not to oppose the Motion, the Coalition negotiated concessions from the District. See Street Letter, *supra* note 3. Thus, like her allegations concerning the suspension rates, Proposed Intervenor's differences with the Coalition lie not in the ultimate objective but in her disagreement with how to achieve this objective.

■ When there is an identity of interest or ultimate objective, mere disagreement over how to achieve the stated goal is insufficient to show inadequacy of representation for purposes of Rule 24(a)(2). *Bradley v. Milliken*, 828 F.2d at 1192 ("A mere disagreement over litigation strategy or individual aspects of a remediation plan does not, in and of itself, establish inadequacy of representation."). The fact that Proposed Intervenor would have made different strategic choices if she controlled the actions of the Coalition does not by itself entitle her to intervene in this lawsuit. *Pate v. Dade County School Bd.*, 588 F.2d 501, 503 (5th Cir.), *cert. denied sub nom. Beckford v. Dade County School Bd.*, 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979); *United States v. Perry County Bd. of Ed.*, 567 F.2d 277, 280 (5th Cir. 1978). Proposed Intervenor has thus failed to satisfy the requirements of Rule 24(a)(2)

and cannot intervene of right in this litigation.

*Permissive Intervention*

Proposed Intervenor argues in the alternative that the Court should permit her to intervene under Rule 24(b)(2), which provides:

> Upon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Ms. Baughn will not be permitted to intervene under Rule 24(a)(2). This desegregation litigation has advanced far into the remedial phase. The only issue remaining before the Court is continued compliance with the parameters of its 1978 order. The Court should be wary of allowing intervention at this late stage and should prevent "cluttering [the] lawsuit[ ] with multitudinous useless intervenors." *Morgan v. Mc-Donough*, 726 F.2d 11, 13–14 (1st Cir.1984) (quoting Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure*, 81 Harv. L. Rev. 356, 403 (1967)).

The Coalition has repeatedly invited Proposed Intervenor to work with it in its

---

quirement; it has not banned their use as a starting point for remedying the effects of segregation. For instance, in *Swann v. Charlotte–Mecklenburg Bd. of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)—a case cited by Proposed Intervenor—the Court stated that "[a]wareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios [as a starting point rather than as an inflexible requirement] was within the discretion of the District Court." *Id.* at 25, 91 S.Ct. at 1280.

Furthermore, although a federal court may not impose a particular numerical racial balance upon a school, *e.g., Milliken v. Bradley*, 418 U.S. 717, 741 n. 19, 94 S.Ct. 3112, 3125 n. 19, 41 L.Ed.2d 1069 (1974), implementation of the reassignment Plan in this case would not amount to imposition of racial quotas by a

federal court. The District of its own accord adopted a target at each school of +/− 5% from the average black population of the District at each grade level. Answering Brief of the State Board at 3–4 (Dkt. 1244); Motion to Deviate Exh. C. It is entirely within the District's authority to do so:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities....

*Swann,* 402 U.S. at 16, 91 S.Ct. at 1276. Since the Court would not be imposing any mathematical ratios upon the schools, Proposed Intervenor's argument is inapplicable to this case.

**314**

representation of the black plaintiff class. At a status conference held February 15, 1990 the Coalition's attorney extended an invitation to Proposed Intervenor to work with the Coalition. Transcript of Status Conference (February 15, 1990) (Dkt. 1234). He renewed his offer at oral argument. Transcript at 52–53. Likewise, there are opportunities for parents to make their views known to the District. Each time an assignment pattern is altered within a school district, some parents will be made unhappy. I am certain there are parents who are equally unhappy with the status quo. Allowing every unhappy parent to intervene and challenge in this Court every reassignment or failure to reassign by the four districts would swell the number of parties in this litigation beyond all boundaries. The Coalition represents the views of the black community in this litigation. Unless and until it is shown that the interests or the strategy of the Coalition differ drastically from the majority of the class it purports to represent, there is no need to allow individual members of the black plaintiff class to intervene. The proper forum for parties with identical interests in this litigation to hammer out strategies for eliminating the vestiges of *de jure* segregation in the schools is not this Court. Rather, parents can make their views known to the Coalition and to the District. The fact that their point of view "lost" is insufficient grounds to justify their presence in this litigation.

Proposed Intervenor's Motion to Intervene will be denied.[7] An Order will be entered consistent with this Opinion.

---

**7.** Courts frequently protect the interests of parties seeking to intervene in a lawsuit by inviting them to appear as amicus curiae in the case. *See Bradley v. Milliken,* 828 F.2d 1186, 1194 (6th Cir.1987). The Court will not do so in this case. First, Ms. Baughn has not requested amicus curiae status. Second, the Court feels that further briefing and argument by Proposed Intervenor on the merits of the Plan would be superfluous. Proposed Intervenor discussed her concerns regarding the Plan at length both in her

briefing and at oral argument on her Motion to Intervene. Those concerns have been addressed in this Opinion, and further exposition of Proposed Intervenor's views regarding the Plan would not aid the Court in its determination of whether to grant the Motion to Deviate. Moreover, allowing Proposed Intervenor to participate as amicus curiae at this stage in the proceedings would unduly delay the Court's decision on the Motion to Deviate.