948 F.2d 1380
 60 USLW 2340
 Samuel WINSTON, Jr., a minor by his parents, Maryann and
Samuel WINSTON, Sr., on behalf of himself and all others
similarly situated; Maryann Winston and Samuel Winston,
Sr., on behalf of themselves and all persons similarly
situated, Appellants,
v.
CHILDREN AND YOUTH SERVICES OF DELAWARE COUNTY; H. Scott
Campbell; Sandra Cornelius; County of Delaware;
John F. White, Jr.
 No. 90-1788.
 United States Court of Appeals, Third Circuit.
 Argued April 11, 1991.
Decided Nov. 7, 1991.
Rehearing Denied Dec. 3, 1991.
 
 Jon J. Auritt, Patricia A. Malley (argued), Media, Pa., for appellants.
 Michael P. Dignazio (argued), Nelson & Dignazio, Media, Pa., for appellees, Children and Youth Services of Delaware County, H. Scott Campbell, Sandra Cornelius, and County of Delaware.
 Anne Fiorenza (argued), Calvin R. Koons, Office of Atty. Gen. of Pa., Harrisburg, Pa., for appellee, John F. White, Jr.
 Anne Vaughan, Margaret A. Lenzi, Delaware County legal Assistance, Chester, Pa., for amicus curiae, Parents Rights Organization in Support of Appellants.
 Samuel B. Magdovitz, Emily Buss, Juvenile Law Center, Philadelphia, Pa., for amicus curiae, Juvenile Law Center.
 Before SLOVITER, Chief Judge, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Plaintiffs appeal from the judgment of the district court entered against them in their action challenging the visitation policy and practice of defendant Children and Youth Services of Delaware County and a regulation of the Pennsylvania Department of Public Welfare as violating the federal Adoption Assistance and Child Welfare Act and plaintiffs' constitutional rights to substantive due process and free association.
 
 I.
 Background Facts and Procedural History
 
 2
 Many of the relevant facts are the subject of a Stipulation of Facts entered into by the parties and filed with the district court. Plaintiffs are Samuel Winston, Sr., his wife Maryann, and Samuel Jr., their son. Samuel Jr., who was then three years old, was taken into custody by the Children and Youth Services agency of Delaware County ("agency" or "CYS") on June 21, 1989, because his father was arrested on June 19 in connection with a drug violation and his mother, who suffered recurrent psychiatric and substance abuse problems, was intoxicated and was being transported to the crisis unit of Crozer-Chester Medical Center. At the time, the family was living in a shelter for homeless persons.
 
 
 3
 Two days later, there was a right-to-detain hearing before a Master of the Court of Common Pleas of Delaware County. The Master continued Samuel Jr. in the protective custody of CYS, inasmuch as Mr. Winston remained incarcerated and Mrs. Winston remained hospitalized. Mr. Winston was released on June 30, 1989, apparently on bail. On July 11, 1989 following an adjudicatory hearing, Samuel Jr. was adjudicated dependent and given to the care of CYS which placed him in foster care. That order provided for visitation by his parents, as arranged by CYS. CYS thereafter advised Mr. and Mrs. Winston that they would have scheduled visitation with Samuel Jr. for one hour every two weeks at the CYS office "during the time that the Agency determined that supervised visitation was necessary." App. at 84. At the request of Mr. Winston, his visits were extended by CYS to one-and-a-half hours in August. In September, the court increased the visits for Mr. Winston to two hours a week.
 
 
 4
 On August 23, 1989, the parents, dissatisfied with the limitations on visits imposed by CYS, filed a class action under 42 U.S.C. § 1983, alleging that the visitation restrictions violated their federal statutory and constitutional rights. They sought declaratory and injunctive relief and named as defendants CYS, Pennsylvania's Department of Public Welfare (DPW), and individual county and state officers.
 
 
 5
 The family continued to have severe domestic difficulties. They were evicted from the shelter because of Mr. Winston's confrontation with the director; thereafter they moved in with a friend who was subsequently evicted; Mr. Winston then returned to the shelter. Around this time, Mrs. Winston was hospitalized again for psychiatric problems. Mr. Winston had weekly visits with his son during October, part of November, and December. During this time, Samuel Jr. was also taken for periodic visits with Mrs. Winston at the hospital. Samuel Jr. was released from foster care and was returned to the physical custody of his father on December 19, 1989, under agency supervision and pending periodic state court review. Mrs. Winston was released from the hospital in January 1990. In March of that year, she and her husband were given legal custody of Samuel Jr., but physical custody of the child was generally granted solely to the father.
 
 
 6
 In the meantime, the federal action proceeded. Plaintiffs moved for an extension of time in which to file for class certification so that they could determine the size and characteristics of the class. On November 27, 1989, the court entered an order granting the motion and extending plaintiffs' time for 90 days to file for class certification. Nonetheless, the next month, before the allotted time had expired, the court denied plaintiffs' request for class certification.
 
 
 7
 DPW moved to dismiss the complaint as to it, and, by stipulation of all parties, DPW was ordered dismissed with prejudice. John F. White, Jr., the Secretary of Public Welfare, remained as a defendant.
 
 
 8
 CYS filed a motion to dismiss the complaint for mootness. The district court denied this motion and proceeded to hold a bench trial, with hearings in April, June, and September 1990. Following completion of the trial, the district court entered judgment for the remaining defendants on all counts. The Winstons appeal. Our review of the court's findings of fact is under the clearly erroneous standard. We give plenary review to its legal conclusions.
 
 II.
 Discussion
 A.
 Preliminary Issues
 
 9
 Before reaching the merits of the appellants' appeal, we must consider whether there is any impediment to our doing so. After the briefs were filed, this court asked the parties to file supplementary briefs directed to the question of (1) whether the return of Samuel Jr. to the custody of his parents affected in any way the relief of declaratory judgment or injunction sought under Counts 1 and 2 of the complaint, respectively, and (2) whether the pending and ongoing state court proceeding in any way precludes the federal court from exercising its jurisdiction and from entertaining the merits of this action at this time. In connection with the latter, we asked the parties whether the doctrine of abstention has any relevance in the context of this proceeding. We consider these issues in turn.
 
 
 10
 The first issue goes to the jurisdiction of this court. It is generally stated that if there is no longer an actual, ongoing case or controversy we may not exercise jurisdiction. Nebraska Press Assn. v. Stuart, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796-97, 49 L.Ed.2d 683 (1976). But see Honig v. Doe, 484 U.S. 305, 331, 108 S.Ct. 592, 608, 98 L.Ed.2d 686 (1988) (Rehnquist, C.J., concurring) ("attenuated connection" of mootness principle to Article III "may be overridden where there are strong reasons to override it."). Thus, we must determine whether the fact that Samuel Jr. is now in the custody of his parents deprives us of our jurisdiction over this matter.
 
 
 11
 Appellants argue that the case is not moot, relying on the exception established for controversies that are "capable of repetition, yet evading review." See Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Appellants call to our attention the orders of the Court of Common Pleas of Delaware County that decreed that while joint legal custody of the child should remain with Mr. and Mrs. Winston, and physical custody should remain with Mr. Winston under the protective supervision of CYS, each of the parents must follow certain conditions, including participation in evaluation and treatment programs and regular visits with a CYS social worker.
 
 
 12
 Appellants argue that their claim "remains live because there is clearly a capability that Samuel Winston, Jr. will again be placed in foster care and his parents would again be subject to the same illegal visitation policies." Appellants' Supplemental Brief at 4. In Honig, the Supreme Court held that an action by an emotionally handicapped student under the Education of the Handicapped Act challenging his suspension from school was not moot, notwithstanding that the child had moved from the school district at issue. The Court concluded that "[g]iven [the student's] continued eligibility for education services under the EHA, the nature of his disability, and [his] insistence that all local school districts retain residual authority to exclude disabled children for dangerous conduct," there was a " 'reasonable expectation' that [the child] would once again be subjected to [the policy and practices challenged in the case]." 484 U.S. at 319-20, 108 S.Ct. at 602-03 (citation omitted). Because there was a sufficient likelihood that the issue could recur with respect to that plaintiff, and any resulting claim he may have for relief would surely evade its review, the Court held the appeal was not moot.
 
 
 13
 This Court has followed the Supreme Court's precedent in giving the "capable of repetition, yet evading review" standard a practical interpretation. See Praxis Properties, Inc. v. Colonial Savings Bank, 947 F.2d 49, 61-62 (3d Cir.1991); Ameron, Inc. v. United States Army Corps of Engineers, 87 F.2d 875, 880-81 (3d Cir.1986). We believe that the same considerations discussed in Honig apply here.
 
 
 14
 Given the nature of the parental conduct that necessitated placement of Samuel Jr. in the protective custody of CYS, there is a reasonable possibility that Samuel Jr. and his parents will once again be faced with the restrictions on visitation that are the subject of this lawsuit. The dissent argues that notwithstanding his mother's history of continued abuse of alcohol and drugs, the possibility that Samuel Jr. will return to custody is speculative. While Mr. Winston's apparent recent stability after his arrest for drug possession is commendable, we cannot share the dissent's optimism that there is no reasonable expectation that the family unit, composed as it is of two parents who have a history of drug use, will not experience another breakdown requiring CYS to retake temporary custody of Samuel Jr. In fact, as appellants have noted, legal custody was returned to the parents only subject to conditions which, if not complied with, could subject them to a repeat of the situation which precipitated this lawsuit.
 
 
 15
 There is also no basis for the dissent's suggestion that the issue of CYS's visitation policy will not evade review because the challenge can be raised by other children who will be in custody for a longer period of time than Samuel Jr. was. The goal of Pennsylvania's Juvenile Act is to have a short-lived period of state custody. The requirement that there be an initial disposition review hearing within six months after the time the child was taken from the custody of his or her parents, 42 Pa.C.S.A. § 6351(e), reflects that goal. Indeed, Samuel Jr. was in the custody of CYS for six months.[1] Although some children undoubtedly stay longer, the dissent cites to an affidavit that merely refers to two such instances. App. at 81. There are no statistics in this record showing the number of children who remain in custody for a period long enough to mount an effective legal challenge to the visitation policy. The time relevant to determine whether an issue may evade review is measured by the "time period for an appellate court ... to complete its review," see Praxis, at 61. In short, there is no assurance in the temporary custody situation that evasion of review will not occur time and time again.
 
 
 16
 Moreover, if the district court had not prematurely denied the class certification, this court would likely face the same merits issues as we decide here.[2] It is difficult to imagine why a class would not be certified in this situation because the visitation policy challenged is generally applicable. When there has been a class certified, the mootness of the class representative's claim does not affect the court's Article III jurisdiction. See Sosna v. Iowa, 419 U.S. 393, 399-403, 95 S.Ct. 553, 557-559, 42 L.Ed.2d 532 (1975).
 
 
 17
 In conclusion, we hold that although the need for an injunction on behalf of the Winstons is no longer live, their request for declaratory relief remains viable and the appeal is not moot merely because Samuel Jr. has been returned to the physical custody of his father.
 
 
 18
 We turn next to the question whether there is any reason for the federal court to abstain from deciding the issues presented. Abstention, unlike mootness, does not present a jurisdictional issue. A party who wishes a federal court to abstain from deciding a live controversy in deference to a pending state action must preserve its claim in both the district court and the court of appeals. CYS and the Commonwealth defendant state that they raised abstention in the district court and that the district court implicitly declined to abstain when it proceeded with trial. Thus, we will assume arguendo that there was an adequate preservation of the issue at the trial level.
 
 
 19
 However, the defendants have not preserved that issue for review in our court. They neither appealed from the district court's failure to abstain nor cross-appealed when the appellants appealed from the adverse judgment. Indeed, because the court had decided the relevant issues favorably to defendants it is perfectly understandable why they would not have challenged the federal court's right to maintain the action.
 
 
 20
 Whatever the reason, defendants failed to preserve any claim for abstention. Even if a cross-appeal was not technically necessary, as the dissent argues, defendants did not even argue in their brief on appeal that the district court should have abstained. Rule 28(a) and (b) of the Federal Rules of Appellate Procedure provide that the parties' briefs shall contain a statement of the issues presented for review. Abstention was not an issue presented by any party. This court has repeatedly declined to address an argument that the party has not raised in its brief as required under Rule 28(a)(4). As we stated in Wisniewski v. Johns-Mansville Corp., 812 F.2d 81, 88 (3d Cir.1987), "[a]n issue that is not addressed in an appellant's brief is deemed waived on appeal." See Peter v. Hess Oil Virgin Islands Corp., 910 F.2d 1179, 1181 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991), (collecting cases); see also Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 237 (3d Cir.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988).
 
 
 21
 The situation is no different when the issue waived is abstention. Indeed, in Brown v. Hotel Employees, 468 U.S. 491, 500 n. 9, 104 S.Ct. 3179, 3184-85 n. 9, 82 L.Ed.2d 373 (1984), the Supreme Court noted that because the State Attorney General did not press the Younger abstention claim, the Court need not address the merits of that claim; it stated that under those circumstances, "considerations of comity are not implicated."
 
 
 22
 A situation analogous to that occurring here was presented to this court in McLaughlin v. Pernsley, 876 F.2d 308 (3d Cir.1989). In that case, which involved a challenge to the City's removal on racial grounds of a foster child from foster parents, this court noted that although the issue of abstention had been raised by the defendants at some point in the district court proceeding, it was not raised by the parties on appeal; therefore, we proceeded to the merits. The language that we used on that occasion is instructive:
 
 
 23
 Neither the City nor any other party has urged in this appeal that the district court should have abstained, e.g., under the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Because abstention is not jurisdictional but implicates the exercise of equitable powers, see Ohio Civil Rights Commission v. Dayton Christian Schools, Inc., 477 U.S. 619, 626, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986), and because abstention would raise the possibility that this five year old child would unnecessarily be exposed to yet another custody transfer before custody is finally determined, we decline to decide the abstention issue on our own motion.
 
 
 24
 Id. at 314 n. 5.
 
 
 25
 Our request that the parties address the issue in supplemental briefs and the defendants' belated attempt to claim abstention without offering any reason for failure to preserve the issue cannot excuse the defendants from the effect of their failure to preserve the issue. We see no reason to deviate from the rule that an issue that has not been preserved in the briefs will not be addressed, particularly when the district court has decided the issues on the merits after a full trial.
 
 
 26
 Because the issue of abstention has been waived, we do not respond to the dissent's discussion of the merits of abstaining here except to note that it is highly unlikely that the plaintiffs' entire challenge encompassed in their federal section 1983 action would have been cognizable in the dependency/custody proceeding that was in progress in the Pennsylvania Court of Common Pleas.
 
 
 27
 Actions or proceedings "[a]gainst the Commonwealth government, including any officer thereof, acting in his official capacity" are within the exclusive jurisdiction of the Commonwealth Court. See 42 Pa.C.S.A. §§ 761(a), 761(b). Plaintiffs challenge, inter alia, a regulation of the State Department of Public Welfare, and name John F. White, Jr., the Secretary of that Department, as a defendant in his official capacity. See Balshy v. Rank, 507 Pa. 384, 490 A.2d 415, 417 (1985) ("Officer" under 42 Pa.C.S.A. § 761 describes " 'those persons who perform statewide policymaking functions and who are charged with the responsibility for independent initiation of administrative policy regarding some sovereign function of state government.' " (quoting Opie v. Glascow, Inc., 30 Pa.Cmwlth. 555, 375 A.2d 396, 398 (1977))). Thus, it appears that plaintiffs' challenge to the DPW regulation could only have been maintained in the Commonwealth Court. Although there is an exception to the Commonwealth Court's exclusive jurisdiction for cases that "sound in trespass," which includes section 1983 cases seeking damages, that exception does not apply when the section 1983 action is for declaratory and injunctive relief, as in this case. See Fawber v. Cohen, 516 Pa. 352, 532 A.2d 429 (1987). Thus it is apparent that even were we to undermine our precedent and consider the advisability of abstaining notwithstanding the parties' waiver of the issue, we could not surmount the authority holding it inappropriate to abstain when the applicable state procedures do not afford the plaintiffs the opportunity to raise their claim in the particular state proceedings. See, e.g., Moore v. Sims, 442 U.S. 415, 425-26 n. 9, 99 S.Ct. 2371, 2378 n. 9, 60 L.Ed.2d 994 (1979).[3]
 
 
 28
 From a jurisprudential standpoint, there is simply no valid reason for this court, following a full trial on the merits in the district court, to decline to hear the plaintiffs' appeal which raises federal statutory and constitutional challenges to a policy that currently affects numerous children similarly situated to Samuel Jr. and which may affect Samuel Jr. himself in the future. We will therefore proceed to consider the merits of plaintiffs' appeal.
 
 B.
 Adoption Assistance Act
 
 29
 We consider first the plaintiffs' statutory challenge to the CYS policy and the DPW regulation before turning to plaintiffs' constitutional attack. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1935) (Brandeis, J., concurring). In support of their argument that they have a federal statutory right to defined minimum visitation rights, plaintiffs rely on the federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-28, 670-79(a) (1988) (AAA or the Act). That statute provides the states with federal funds to make needed improvements in their child welfare and social services programs, enhance federal support for needy and dependent children in foster care, encourage the permanent adoption of children with special needs, and reduce the time spent in foster care by any child. In order to reduce time spent in foster care, Congress provided incentives to encourage either the return of foster children to their own families or the permanent placement of foster children in adoptive homes. S.Rep. No. 336, 96th Cong., 2d Sess. 1, 12, 15, reprinted in 1980 U.S.Code Cong. & Admin.News 1448, 1450, 1461, 1465.
 
 
 30
 In the language at issue here, section 671(a) of the Act provides that:[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which--
 
 
 31
 ....
 
 
 32
 (15) ... provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home....
 
 42 U.S.C. § 671(a)(15) (emphasis added).[4]
 
 33
 It is plaintiffs' thesis that the Act places an affirmative obligation on agencies of participating states to replace their current visitation policies with a policy of individualized visitation plans based on the particular needs and circumstances of each family. Plaintiffs argue that we should construe the agency's statutory duty to make "reasonable efforts" to return children to their parents as encompassing a minimum visitation period of four hours per week for the family, preferably at a location other than the agency offices, unless otherwise inappropriate. Finally, plaintiffs argue that because the DPW regulation supports CYS's uniform policy of one hour biweekly visitation between parents and their children, it too violates the AAA's requirement of "reasonable efforts" to reunify families.
 
 
 34
 As an initial matter, we must decide whether the provision of the statute requiring states to make "reasonable efforts" toward reunification is enforceable in a judicial proceeding. The Supreme Court has recently outlined the criteria for determining whether a statute contains a privately enforceable right. The Court held that a statute creates a federal right if it was intended to benefit the putative plaintiff, imposes a binding obligation on the state or other governmental unit, and is not " 'too vague and amorphous' such that it is beyond the competence of the judiciary to enforce." Wilder v. Virginia Hosp. Ass'n, --- U.S. ----, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) (internal quotations omitted). Once plaintiffs identify "a substantial provision that gives them a tangible right, privilege, or immunity, the burden is on the defendants to demonstrate that Congress intended to foreclose private enforcement of a right that is otherwise evident." Artist M. v. Johnson, 917 F.2d 980, 986 (7th Cir.1990), cert. granted sub nom. Suter v. Artist M., --- U.S. ----, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991).
 
 
 35
 The Court in Wilder found enforceable under section 1983 the Boren amendment to the Medicaid statute that requires reimbursement at rates a state finds are "reasonable and adequate" to meet the costs incurred by hospitals and other facilities. 110 S.Ct. at 2519. The Court noted that the amendment used "mandatory rather than precatory terms" in requiring states to provide "reasonable and adequate" payment to hospitals. Id. The Court distinguished between a holding that an issue is not subject to court challenge and a holding that it is one over which the states have discretion:
 
 
 36
 That the Amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the Amendment, but it does not render the Amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are some rates outside that range that no State could ever find reasonable and adequate under the Act.... [S]uch an inquiry is well within the competence of the judiciary.
 
 
 37
 Id. at 2523.
 
 
 38
 The Court in Wilder concluded that Congress intended that hospitals should be able to challenge the state's rates as unreasonable. Similarly, in Wright v. Roanoke Redev. and Housing Auth., 479 U.S. 418, 429-32, 107 S.Ct. 766, 773-75, 93 L.Ed.2d 781 (1987), the Court held that in a section 1983 action plaintiffs can enforce a housing statute that guarantees that a "reasonable" allowance for utilities will be counted in low-income tenants' rents. In so holding, the Court rejected the contention that the provision for a "reasonable" allowance was too vague and amorphous to confer on tenants an enforceable right.
 
 
 39
 Courts considering the "reasonable efforts" provision of subsection 671(a)(15) of the AAA have held that it creates enforceable rights. See, e.g., Artist M., 917 F.2d 980; J.L. ex rel. Darr v. Massinga, 838 F.2d 118, 123 (4th Cir.1988), cert. denied, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); Lynch v. Dukakis, 719 F.2d 504, 509-12 (1st Cir.1983); LaShawn v. Dixon, 762 F.Supp. 959 (D.D.C.1991). The issue was given its fullest treatment in Artist M., where plaintiffs alleged that the state agency's practice of not promptly assigning caseworkers to children in its care (and not promptly reassigning one when a caseworker leaves the agency) violated the "reasonable efforts" requirement of subsection 671(a)(15) as well as the requirement of subsection 671(a)(16) to develop "a case plan" and an individualized case review system for each child in foster care. The court found the "reasonable efforts" clause enforceable, and noted that even though the agency "has substantial discretion in choosing the method it will use to implement the requirements of the AAA," courts "nevertheless [are] capable of determining whether the state is exerting 'reasonable efforts' to provide those services." Artist M., 917 F.2d at 987.
 
 
 40
 We believe that analysis is apt here. First, it is clear that subsection 671(a) is intended to benefit families, such as the Winstons, see, id. at 986-87, thus meeting the first prong of Wilder. Second, like the Medicaid provision at issue in Wilder, subsection 671(a) specifies the requirements that states must meet in order to receive federal funding. The statute, under the heading "Requisite features of State plan," provides that a state "shall have a plan [which provides that] reasonable efforts will be made ... to make it possible for the child to return to his home...." 42 U.S.C. § 671(a)(15) (emphasis added). These provisions express more than mere "congressional preference" in precatory terms, but impose a "binding obligation" on participating states in exchange for receipt of federal funding. The second prong of the Wilder inquiry is therefore satisfied.
 
 
 41
 Finally, we look to whether subsection 671(a)(15), by requiring states to make "reasonable efforts" toward family reunification after the state has taken custody of a child, creates a right sufficiently clear and specific to be enforced. Courts have long experience with enforcing reasonableness standards, in contexts ranging from state tort law to the Fourth Amendment prohibition on unreasonable searches. Indeed, the language of subsection 671(a)(15) is similar to that of the Medicaid provision at issue in Wilder, which required that reimbursement rates be "reasonable and adequate to meet the costs" incurred by health care providers. The final Wilder consideration is met because the right asserted by plaintiffs is not so vague and amorphous as to be beyond the competence of courts to enforce. We therefore conclude that subsection 671(a)(15) creates rights enforceable by private plaintiffs.
 
 
 42
 It does not necessarily follow that a specified minimal level of visitation is an essential or enforceable component of the "reasonable efforts" the state is required to make toward family reunification. The district court held that because each state is "afforded considerable flexibility in unilaterally developing procedures compatible with its own unique foster care circumstances," the Act "cannot be read to require the states to provide a particular quantum of supervised visitation, or even any visitation at all" if it provided "other reunification services." App. at 14.
 
 
 43
 We need not decide today whether a state regulation or an agency policy that did not provide some visitation could survive a statutory challenge. But cf. Scrivner v. Andrews, 816 F.2d 261, 264 (6th Cir.1987) ("The Act neither explicitly nor implicitly creates a federal statutory right to 'meaningful visitation' "). There is no dispute between the parties about the importance of visitation to the goal of reuniting parents and child. The parties agreed in their stipulation of facts that "[r]esearch has shown conclusively that regular visits between parents and children are the most important factor in ensuring that children are returned home." App. at 88. CYS's own internal policy states the same, adding that visitation is "critical" and "vital" to family bonding and maintenance. App. at 295-96.
 
 
 44
 In fact, the DPW regulation challenged by plaintiffs provides: "The county agency shall provide opportunity for visits between child and parents as frequently as possible but no less frequently than once every 2 weeks at a time and place convenient to the parties and in a location that will permit natural interaction...." 55 Pa.Code § 3130.68(a) (1989). The regulation does not specify the length of the required visit. The CYS policy to set all visits initially at one hour biweekly is designed to meet the mandate of that regulation. Thus, the only challenge in this case goes to the amount of visitation that is necessary for the agreed upon goal.
 
 
 45
 The absence of any language in subsection 671(a) expressly providing a right to visitation or identifying visitation as an essential component of the "reasonable efforts ... [toward] mak[ing] it possible for the child to return to his home" makes plaintiffs' statutory argument problematic. The only legislative history referring to visitation is in the context of the Act's emphasis on family reunification and the de-emphasis on institutionalization and temporary placement.[5] There is no suggestion that the statute encompasses a specified time and frequency of visitation.
 
 
 46
 Plaintiffs argue that the one hour biweekly visitation is "grossly inadequate." They characterize the expert testimony of Dr. David Fanshel as stating "that a minimum schedule of four hours a week should be utilized." Appellants' Brief at 16. Dr. Fanshel did refer to his suggested rule of four hours or half a day of visiting as preferable to the "minimalist approach." App. at 156. However, the Act has been construed as giving substantial discretion to the states in determining appropriate policy within the broad range of "reasonable efforts." See Artist M., 917 F.2d at 987 (a state Department of Children and Family Services "has substantial discretion in choosing the method it will use to implement the requirements of the AAA"); Cf. Wilder, 110 S.Ct. at 2523 (that the statute "gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the Amendment").
 
 
 47
 The professional consensus undoubtedly is that parental visitation should be a part of reunification efforts to the fullest extent that the circumstances of an individual case allow. However, as the plaintiffs' expert acknowledged, visitation is not appropriate in all cases in which a child has been taken from his or her parents, and there are some cases for which "severely restricted" visitation is appropriate. App. at 133. In light of the differing circumstances presented by each family situation, we cannot find any basis in the statute for equating "reasonable efforts" with a four hour weekly visitation.[6] 6] See Scrivner, 816 F.2d at 264 (rejecting statutory challenge to initial visitation of one hour biweekly).
 
 
 48
 CYS introduced a joint affidavit by its Administrator of Placement Services, Chief of Professional Services, and Administrator of Legal Services stating that they are the professionals within the agency who developed CYS's visitation policies, that in doing so they relied upon their professional experience, and that "[t]he policies were formulated based upon accepted professional judgement [sic], practice and standards...." App. at 283. Significantly, the Stipulation of Facts in this case states that "[a]t the discretion of the social worker subsequent visits which are supervised in the agency office are eventually extended up to two hours biweekly in some cases." App. at 91. Because the statute does not specify visitation as a required component of the "reasonable efforts" requirement and the agency exercised discretion in establishing a visitation policy comporting with professional standards, we find no statutory authorization for the court to "inject[ ] itself into the operations of the [agency]." Artist M., 917 F.2d at 988. Accordingly, we conclude that plaintiffs have not established that the CYS visitation policy, and the DPW regulation which authorized that policy, violate the Adoption Assistance Act.
 
 C.
 Constitutional Issues
 
 49
 The Winstons also challenge the CYS policy as violative of their substantive due process and free association rights under the First, Ninth, and Fourteenth Amendments. The essence of their claim is the same under all of the constitutional provisions invoked. Plaintiffs argue that, as parents, they have a fundamental liberty interest in the care, custody, and management of their children that is protected by the due process clause of the Fourteenth Amendment, that this fundamental interest includes a right to communicate with the child, and that this right of association is protected as well by the First Amendment. They contend that restrictions on this associational right must be evaluated under heightened scrutiny, and that CYS's current visitation policy does not withstand that scrutiny because the agency could adopt a policy which facilitated visits and was less restrictive.
 
 
 50
 We agree with plaintiffs that the parental interest "does not evaporate simply because [the natural parents] have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982) (citing cases); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972); Prisco v. United States Dep't of Justice, 851 F.2d 93, 97 (3d Cir.1988), cert. denied, 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 985 (1989). In this case, however, there is no challenge to the state's assumption of custody over Samuel Jr. Instead, we have what counsel characterized at oral argument as a facial challenge to the CYS policy and DPW regulation.
 
 
 51
 It does not follow that once the state has met the requisite standard justifying its radical intervention in the parent-child relationship by taking custody of the child, strict scrutiny must be applied to every decision made while the child remains in state custody. In this respect, we can consider children in foster care as analogous to the institutionalized mental patients at issue in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). See Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 794-97 (11th Cir.1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); Doe v. New York City Dep't of Social Services, 649 F.2d 134, 141-42 (2d Cir.1981).
 
 
 52
 In Youngberg, the Court held that an involuntarily committed mentally retarded plaintiff had a substantive due process right to training and "habilitation" by the state as well as safety and minimal restraint. However, the Court defined the liberty interest as the right only to "minimally adequate or reasonable training [needed] to ensure safety and freedom from undue restraint." Youngberg, 457 U.S. at 319, 102 S.Ct. at 2460.
 
 
 53
 Significantly, for our purposes, the Court did not apply a strict scrutiny standard, which requires the state to justify each restraint under a least restrictive analysis. Instead, Youngberg stated that the level of care that a state must provide "must be determined by balancing [the patient's] liberty interests against the relevant state interests." Id. at 321, 102 S.Ct. at 2461. Furthermore, the "courts must show deference to the judgment exercised by a qualified professional." Id. at 322, 102 S.Ct. at 2461.
 
 
 54
 [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.
 
 
 55
 Id. at 323, 102 S.Ct. at 2462 (footnotes omitted).
 
 
 56
 The district court applied the Youngberg standard in concluding that CYS's visitation policy did not fall below minimum professional standards and therefore did not violate plaintiffs' rights to due process. The Court noted that Dr. Fanshel admitted on cross-examination that he did not know of any jurisdiction which requires weekly visits with children in custody.[7] Indeed, Dr. Fanshel, who characterized CYS's one hour biweekly visitation schedule as "extremely meager" and "noxious," never stated that it was below professional standards, much less a "substantial departure" from them. In fact, Dr. Fanshel phrased his recommended schedule of four hours weekly as an "appropriate" amount of time, not as the minimum amount needed to meet professional standards.
 
 
 57
 Much of Dr. Fanshel's testimony focused on what would be beneficial or optimal for children and their families. Furthermore, he admitted that several leading authorities on foster care generally urge "frequent" visitation but have not specified a standard minimum time. Similarly, the other authorities on whom plaintiffs rely in their briefs (including CYS policy statements) generally urge frequent visitation and may recommend more visitation, but none specifically says that the CYS policy is below professional standards.
 
 
 58
 We believe that it is particularly significant that the CYS policy and the state procedural scheme provide an opportunity to seek increased visitation, when appropriate. The social worker may increase visitation, as was done in this case, and the court may increase it even further, as was also done here. Although plaintiffs complain that this procedure is time-consuming and there is a lag, we cannot hold that the ability to get redress is so cumbersome as to be effectively unavailable. We do not suggest that plaintiffs' interests in association with their son, maintained through visitation, are not substantial. In fact, Mr. Winston in particular has shown strong filial attachment. However, in balancing the respective interests we must give due consideration to the fact, stipulated by the parties, that CYS formulated its visitation policy based, in part, on the "lack of funds and staff." App. at 85. Weighing all the relevant interests, we cannot hold that the policy is unconstitutional.
 
 D.
 Class Certification
 
 59
 Plaintiffs also appeal from the district court's order denying their request for class certification. Our review of a district court's decision on class certification is for abuse of discretion. Eisenberg v. Gagnon, 766 F.2d 770, 784-85 (3d Cir.), cert. denied, sub nom. Pelino v. Eisenberg, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). In this case, however, no opinion was issued with the order and we are thus unable to ascertain whether the district court believed plaintiffs were in procedural default or whether the court ruled against the proposed class on the merits.
 
 
 60
 Under the district court's local rules, plaintiffs are required to seek class certification within 90 days of filing of the complaint. Rule 27 of the Local Rules, E.D.Pa. On November 17, 1989, plaintiffs moved for a 90-day extension of time to file for class certification because they were still in the initial stages of discovery. On November 22, 1989, the district court granted the motion, expressly giving plaintiffs "90 additional days from the date of this Order ... to file for class certification." App. at 56. Then, on December 14, 1989, only 22 days later and before plaintiffs filed any documentation in support of the class, the district court denied "Plaintiffs' application for class certification." App. at 57. Plaintiffs claim they never filed such an application, and the docket sheet does not show that an application was filed.
 
 
 61
 The procedure followed by the district court is clearly faulty. Once the court gave plaintiffs an extension of time to file for class certification, it was obliged to await receipt of that application before acting on it. We assume it overlooked the extension it had granted to plaintiffs. However, if our decision on the merits could be different were we dealing with a class action, we would be required to remand so that the district court could give due consideration to plaintiffs' application for class certification. That we do not do so is in the interest of judicial expediency, because we conclude that maintenance of a class action could not alter the result of this case in the posture presented to us. But see supra note 2.
 
 
 62
 Our legal analysis of the federal statute is not dependent on the existence vel non of a class. In light of the absence of any indication from the statutory language or legislative history that the requirement that agencies make "reasonable efforts" toward reunification encompasses a requirement of a four hour weekly visitation policy, we have concluded that the CYS policy for an initial one hour biweekly visit does not provide such meager visitation rights as to constitute an inadequate "effort." Similarly, our conclusion that the CYS policy and the regulation do not violate a parent's constitutional right to familial association whether viewed from the standpoint of the Fourteenth Amendment or the First Amendment, was made in light of the evidence that the CYS policy was established as a result of the judgment of qualified professionals, the absence of any firm evidence that this policy falls below professional standards, the stipulated fact that the policy was made, in part, because of lack of funds and personnel, and the discretion that must be accorded to state regulations applicable to persons in custody. It is thus clear that plaintiffs' facial challenge to the CYS policy and the DPW regulation could not have been aided by the presence of a class.
 
 
 63
 There is some ambiguity from plaintiffs' pleadings as to whether they were making a facial or an as-applied challenge. In response to a direct question by the court, plaintiffs' counsel stated that they were mounting a facial challenge. In any event, plaintiffs have not shown what facts they might have adduced on behalf of a class which would have supported an as-applied constitutional challenge to CYS's visitation policy. Under these circumstances, we limit our decision to the plaintiffs' facial challenge to the CYS policy, as administered as set forth in the stipulated facts. As so construed, our decision would not be different had a class been certified. Thus, we see no reason to remand so that the district court can reconsider its decision on class certification.
 
 IV.
 
 64
 For the reasons set forth above, we will affirm the district court's judgment in favor of defendants. Each party to bear its own costs.
 
 GARTH, Circuit Judge, dissenting:
 
 65
 I cannot agree with the court's disposition of the Winston claim. In my opinion, the Winstons' claim is obviously moot, or, at the very least, the district court should have abstained from reaching a merits decision.
 
 
 66
 * On December 28, 1989, almost two years ago, the Court of Common Pleas restored Samuel Jr. to the physical custody of his father.[1] Since that date, no question concerning the CYS visitation policy could arise, inasmuch as Samuel Jr. has resided with his father.[2] State court hearings reviewing Samuel Jr.'s custody continue, however, and are thus ongoing.[3] Samuel Jr.'s return to his father's physical custody, therefore, immediately raises concerns as to whether the relinquishment of custody by Delaware County's Children's and Youth Services moots the Winstons' entire action.
 
 A.
 
 67
 To overcome mooting of an action, where a plaintiff seeks equitable relief for a past harm, the plaintiff must establish that the challenged harm was too short in duration to be litigated to conclusion during its pendency, and that the harm is capable of repetition yet evading review. See, e.g., Honig v. Doe, 484 U.S. 305, 318, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988). In assessing the likelihood that a plaintiff will again be subject to a given injury, the Court has generally been unwilling to assume that the party seeking relief will repeat the type of misconduct that placed him in the position underlying his claim. Id.
 
 
 68
 In Murphy v. Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam), Hunt, charged with first degree sexual assault, challenged the denial of his application for bail. Hunt claimed that the Nebraska Constitution's limitation on bail in cases of first degree sexual offenses, violated his federal constitutional rights. The Court noted that his "claim to pretrial bail was moot once he was convicted," id. at 481, 102 S.Ct. at 1183, and Hunt could not show a "reasonable expectation" or "demonstrated possibility," id. at 483, 102 S.Ct. at 1184, that he would again "be in a position to demand bail before trial." Id. at 484, 102 S.Ct. at 1184. The Court stated that it had "never held that a mere physical or theoretical possibility was sufficient to satisfy" the test that a harm be capable of repetition yet evading review. Id. at 482, 102 S.Ct. at 1183-84. See O'Shea v. Littleton, 414 U.S. 488, 497, 94 S.Ct. 669, 676-77, 38 L.Ed.2d 674 (1974) (unlikely that parties challenging discriminatory bond-setting, sentencing, and jury-fee practices would again violate valid criminal laws).
 
 
 69
 In light of Supreme Court precedents, I have serious concerns as to whether the Winstons have established a reasonable likelihood that they will be subject to the same circumstances, i.e., being deprived of Samuel Jr.'s custody, again. Honig, 484 U.S. at 318, 108 S.Ct. at 601. See Supp. Brief of Appellants at 5-7.
 
 
 70
 While Samuel Jr. has been returned to his father's custody, the Winstons remain subject to the court-ordered supervision of CYS. Yet, for Samuel Jr.'s present custody status to be reversed, it would require his father to be arrested once again. It should be remembered that Winston Sr. had been arrested for what appears to be a most minor infraction. Indeed, the record discloses (A83-84) that he was arrested on a minor drug possession charge, that he was imprisoned in default of bail, that he was released from the Delaware County Prison eleven days later (A94) and that he was placed on probation.
 
 
 71
 Like the courts in Murphy and O'Shea, I am not prepared to concede or foresee the likelihood of Mr. Winston's future involvements with the law, even though I acknowledge that Samuel Jr.'s mother may continue to forego future physical custody of Samuel Jr. by her continued abuse of alcohol and drugs. See City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983) (capable of repetition doctrine applies "only in exceptional situations, and generally only where the ... plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality"); Cospito v. Heckler, 742 F.2d 72, 79 (3d Cir.1984) (case moot because no "reasonable expectation that the same complaining parties would be subject to the same action again"), cert. denied, 471 U.S. 1131, 105 S.Ct. 2665, 86 L.Ed.2d 282 (1985).
 
 
 72
 The Supreme Court's discussion in Preiser v. Newkirk, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1978) of the reasonable expectation of a wrong being repeated in the context of mootness is instructive. Newkirk had been incarcerated in a maximum security institution until 1971. He was then transferred to a medium security institution. In 1972, Newkirk, who had apparently agitated for a "prisoners' union," was transferred to a maximum security institution. He then brought a § 1983 action against the Superintendent of the medium security prison and against the State Commissioner of Correctional Services for a declaratory judgment that his transfer was in violation of the Constitution. He also sought an injunction prohibiting future transfers without a hearing. Subsequently, Newkirk was returned to Walkill, the medium security prison.
 
 
 73
 The district court held that Newkirk's constitutional rights had been violated, but denied an injunction against future summary transfers. The Court of Appeals affirmed the district court with some modifications, and held that Newkirk's action was not moot since Newkirk remained subject to a new transfer at any time.
 
 
 74
 Contrary to the Court of Appeals, the Supreme Court in holding that Newkirk's action was moot, stated:
 
 
 75
 [A] federal court has neither the power to render advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them." Its judgments must resolve " 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts.' " ... "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."
 
 
 76
 Id. at 401 (citations omitted). The Court took note of circumstances strikingly analogous to the circumstances present in the Winstons' case. Referring to Newkirk's fear of retransfer to a maximum security institution, Chief Justice Burger wrote:
 
 
 77
 "Any subjective fear Newkirk might entertain of being again transferred, under circumstances similar to those alleged in the complaint, or of suffering adverse consequences as a result of the 1972 transfer, is indeed remote and speculative and hardly casts that 'continuing and brooding presence' over him that concerned the Court in Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122 [94 S.Ct. 1694, 1698, 40 L.Ed.2d 1] (1974)."
 
 
 78
 Here, the prospect of Winston Sr.'s rearrest is as "remote and speculative" as Newkirk's fear of retransfer. Winston Jr. has now spent an uneventful two years in residence with his father and nothing appears of record which would bear out a claim that Winston Sr.'s rearrest, if it ever occurred, was "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id., quoting Maryland Casualty Co. v. Pacific Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).[4]
 
 
 79
 Thus, on the present record, no showing appears that there is a reasonable expectation that Winston Sr. will again be arrested and be unable to provide custodial care for Samuel Jr.
 
 B.
 
 80
 Even if the assessment of Winston Sr.'s future arrest status is considered to be flawed, and the record is devoid of any evidence to that effect, nonetheless, the Winstons have not shown that their claims will evade review, an essential component of the mootness doctrine.[5] As the Supreme Court noted in DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974):
 
 
 81
 just because this particular case did not reach the Court until the eve of the petitioner's graduation from law school, it hardly follows that the issue he raises will in the future evade review. If the admission procedures of the Law School remain unchanged, there is no reason to suppose that a subsequent case attacking those procedures will not come with relative speed to this Court.
 
 
 82
 Id. at 319, 94 S.Ct. at 1707. The Winstons note in their initial brief to this Court that CYS's visitation policy affects, at any given time, 175 to 200 children in Delaware County, or approximately 35 to 40% of the children in CYS out-of-home placements, and can last "for six months, ten months, fifteen months, and longer." Brief of Appellant at 7 (citing A81-82). The Winstons' term of restricted visitation was relatively brief when compared to the custodial terms of the other children, and there is no reason to think that another family, subject for a longer period of time to CYS's visitation policy, will not successfully litigate a claim challenging it.[6]
 
 
 83
 Moreover, Samuel Jr.'s custody has been, and is presently, the subject of constant state court review, see note 3, supra. Those court decrees have in each instance detailed the conditions and terms of Samuel Jr.'s custody. I am mindful that, in the event CYS, in the future, was to seek custody over Samuel Jr. once again, it would be obliged to do so through court proceedings in the Court of Common Pleas of Delaware County, Pennsylvania. Such proceedings would necessarily permit an immediate opportunity for either or both of Samuel's parents to challenge the frequency and extent of visitation rights. Hence, because of the state court's conscientious and continuing supervision over Samuel Jr.'s custody, there can be no practical possibility of any claim made by the Winstons, respecting visitation rights, evading review.
 
 
 84
 I do not argue that the "evading review" criterion of the mootness doctrine can be satisfied by state court actions. I make reference to the supervision of the Common Pleas court over Samuel Jr.'s custody only to point out that, pragmatically, review of Samuel Jr.'s status has been constant, consistent and continuing, since his original custody by CYS.
 
 
 85
 In view of the return of Samuel Jr. to the legal custody of both parents and more particularly to the physical custody of his father, and in view of the resultant inapplicability of the challenged CYS visitation policy, and in view of the fact that the circumstances giving rise to Samuel Jr.'s custody by CYS are remote, speculative, and not foreseeable as being repeated, and would almost certainly not evade review, it is evident to me that the Winstons' claims are moot. I would vacate the district court's judgment in favor of the defendants and remand the case to the district court with instructions that it be dismissed. See United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). Cf. Clarendon v. Nu-West Industries, 936 F.2d 127 (3d Cir.1991) (Sloviter, C.J.).
 
 II
 A.
 
 86
 Although I am convinced under any test that this appeal has been mooted, I am not persuaded by Judge Sloviter's opinion that we should nevertheless treat with the merits of the case.
 
 
 87
 It is clear to me that the district court should have abstained and remitted the proceeding to the state court for its determination. The majority opinion holds that because no cross-appeal was filed by CYS, we may not consider the issue of abstention as it is not preserved for appeal. (Maj.Op. at 1384-86).
 
 
 88
 Yet, in Rhoads v. Ford Motor Co., 514 F.2d 931, 934 (3d Cir.1975), Judge Aldisert, writing for our court, stated that the failure to file a cross appeal did not preclude our consideration of the particular issues:
 
 
 89
 While better practice would have dictated that Rhoads file a protective cross appeal, in these circumstances we will not allow his failure to file a notice of appeal to preclude our review of the record. In this respect, we follow the rule we recently invoked in a modified context: once appellate jurisdiction attaches, " 'the power of the court of appeals should be plenary to the extent that it chooses to exercise it. A court should not close its eyes to what is plainly there.' " McCreary Tire & Rubber Co. v. CEAT S.p.A., 501 F.2d 1032, 1038 (3 Cir.1974), [sic.] quoting 9 J. Moore, Federal Practice p 110.25, at 273 (2d ed. 1973).
 
 
 90
 The authorities on which Judge Sloviter relies are not otherwise. None of those authorities denies that a Court of Appeals has plenary power "to the extent that it chooses to exercise it." Even if Rhoads did not provide authority, as it indeed does, for us to consider abstention in our present context, we may still consider the issue of abstention, even without a cross appeal, because CYS neither seeks to increase its rights nor decrease the rights of the Winstons. See Scott v. University of Delaware, 601 F.2d 76, 82 n. 12 (3d Cir.1979); 15 C. Wright & A. Miller, Federal Practice and Procedure, § 3904 (1976).
 
 
 91
 Here, CYS had fully prevailed in the district court, even though its contention that the district court should abstain had been rejected. Hence, CYS's position may best be characterized as arguing that if the district court's judgment in its favor is not affirmed, then we should instruct the district court to dismiss the action and abstain pursuant to Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970), thereby leaving the state court available to resolve the interests of the parties. Nor can it be said that CYS is seeking in any way to lessen the rights of the Winstons. The district court ruled against the Winstons on the merits and thus, at this stage, the Winstons have a judgment against them. The only result of abstention would be to permit the Winstons to litigate visitation issues in the state court--indeed, in the very state court that has been exercising continual supervision over the terms and conditions of Samuel Jr.'s custody.
 
 
 92
 Judge Adams in his concurrence in Scott v. University of Delaware, 601 F.2d 76, 91-92 (3d Cir.1979), also addressed the issue of an litigant who had prevailed in the district court but who had not cross-appealed:
 
 
 93
 Inasmuch as the purpose for filing a notice of appeal or notice of a cross appeal is to invoke appellate jurisdiction to review a judgment and to have the adversary notified that the judgment is being challenged. I see no reason to require the appellee to file a cross appeal in order to preserve a backup ground for protecting a judgment that has been rendered in its favor when an appeal has already been filed from that judgment.... Such an appellee is likely to neglect to file a cross appeal because he is satisfied with the ultimate outcome of the trial.
 
 
 94
 Thus, under any authority, but particularly under Rhoads, it is plain to me that the issue of visitation, if not moot, as I believe it clearly is for the reasons which I have noted above, should be the subject of abstention under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970). The failure of CYS, which had received a favorable order from the district court, to file a cross-appeal, should not make us "close our eyes to what is plainly there," see Rhoads, 514 F.2d at 934,--a matter of vital state concern presently being monitored by the Court of Common Pleas of Delaware County.
 
 
 95
 The cases cited by Judge Sloviter (Maj.Op. at 1385-86) for the proposition that CYS's failure to cross-appeal constitutes a waiver of the abstention issue, hold no more than that we may exercise our equitable powers to rule on such an issue. The fact that Brown v. Hotel Employees, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984), McLaughlin v. Pernsley, 876 F.2d 308 (3d Cir.1989), and Wisniewski v. Johns-Mansville Corp., 812 F.2d 81 (3d Cir.1987) declined to entertain the merits of the "waived" claims in their particular cases cannot require us to decline consideration of the abstention issue here.
 
 
 96
 To the contrary, an appropriate exercise of our equitable powers pursuant to controlling precedent in this Circuit would require consideration of whether the district court should have abstained. See Scott v. University of Delaware, 601 F.2d 76 (3d Cir.1979); Rhoads v. Ford Motor Co., 514 F.2d 931 (3d Cir.1975). Rhoads and Scott furnish ample authority for us to entertain the merits of abstention even absent CYS's cross-appeal.
 
 
 97
 Significantly, Judge Sloviter has neither addressed nor mentioned Rhoads or Scott in her "waiver" discussion. Had she done so, it is evident to me that she could not have concluded that, by failing to cross-appeal, CYS had waived the question of abstention.
 
 
 98
 Under the circumstances present here, a federal court should not intrude in the state processes involving family custody issues, but rather, should abstain.
 
 
 99
 The notion of "comity" includes "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." ... Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights.
 
 
 100
 Middlesex Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431, 102 S.Ct. 2515, 2520-21, 73 L.Ed.2d 116 (1982) (emphasis in original) (citations omitted).
 
 
 101
 Based on these principles, "[t]he Younger doctrine, which counsels federal court abstention when there is a pending state proceeding, reflects a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff." Moore v. Sims, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (citing Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). A federal court should abstain in a case where a state proceeding involving important state interests is ongoing, in which the federal plaintiff had an opportunity to raise his or her federal claims. See Moore, 442 U.S. at 423-25, 99 S.Ct. at 2377-78. Because the Winstons are currently subject to ongoing state proceedings[7] that determine, on a continual basis, their custody and visitation rights as to Samuel, Jr., the district court should have abstained if the state's interest in this litigation is strong, as it is, and if the Winstons had an opportunity to present their federal claims in state court.
 
 B.
 
 102
 First, the Supreme Court has clearly established that "[f]amily relations are a traditional area of state concern." Moore, 442 U.S. at 435, 99 S.Ct. at 2383.[8] In Moore, the Court held that, in light of pending state proceedings involving alleged instances of child abuse, a federal district court should not have exercised its jurisdiction in that case to hold various aspects of the Texas Family Code to be unconstitutional. Id. at 418, 99 S.Ct. at 2374-75. Following a report from school authorities, the Texas Department of Human Resources, ("Department"), took temporary custody of the three Sims children to protect them from physical abuse by their parents. Id. at 419, 99 S.Ct. at 2375. The Simses challenged the constitutionality of the state statute under which their children were placed in the Department's custody, and, after a long and winding road through the state and federal courts, a three judge panel of the federal district court entered a preliminary injunction enjoining the Department from prosecuting any state proceeding under the challenged state statutes until the case was resolved by the three judge panel. Id. at 420-22, 99 S.Ct. at 2375-77. The district court ultimately concluded that Younger abstention was unwarranted in the case, and addressed the merits of the Sims' due process challenges.
 
 
 103
 In holding that the federal district court should have abstained pursuant to Younger, the Supreme Court noted, among other things, that family relations are traditionally an area of state concern, that the state has a compelling interest in removing victims of child abuse quickly and effectively from their parents, and that "[w]e are unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation." Id. at 435, 99 S.Ct. at 2383.
 
 
 104
 Here, as in Moore, the Commonwealth and its agency are parties to the state proceedings, and the temporary removal of a child from his or her parents for protective purposes is " 'in aid of and closely related to criminal statutes.' " Id. at 423, 99 S.Ct. at 2377 (quoting Hoffman v. Pursue, Ltd., 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975)). The existence of such circumstances determines the applicability of Younger abstention in a federal action, Moore, 442 U.S. at 423, 99 S.Ct. at 2377, and the nature of the state's interest in this case is indistinguishable from the state's interest in Moore, where the court upheld that interest as paramount. Id. at 435, 99 S.Ct. at 2383. Pennsylvania, then, clearly has a strong interest in administering its child welfare procedures and in adjudicating controversies that arise from that administration, and this case is a classic example of the type of state interest which calls for Younger abstention.
 
 C.
 
 105
 Second, the Winstons may be afforded a federal forum only if the state proceedings did not provide an adequate opportunity to present their federal claims, id. at 430, 99 S.Ct. at 2380-81, and they must sustain the burden of showing that a state procedural law barred them from presenting those claims. Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 14, 107 S.Ct. 1519, 1527-28, 95 L.Ed.2d 1 (1987). While the Winstons have broadly asserted that they had no opportunity to raise their federal claims at the state level, and have stated that their challenge to the CYS policy was not at issue in the state court hearings, they have done no more than offer these assertions. Supp.Brief of Appellant at 10, 12. They have pointed to no state rule or law that precluded them from putting their federal claims at issue in the ongoing state proceeding.
 
 
 106
 As the Court noted in Moore, the "question is whether [the] challenge can be raised in the pending state proceedings subject to conventional limits on justiciability." Moore, 442 U.S. at 425, 99 S.Ct. at 2378. Here, as in Moore, the state forum appears to be as accommodating as the federal courts and "abstention is appropriate unless state law clearly bars the interposition of the [federal] claims." Id. at 425-26, 99 S.Ct. at 2378-79. See McTeague v. Sosnowski, 617 F.2d 1016, 1021 (3d Cir.1980) ("If deference to the state proceeding means that she will be unable to raise her concerns, abstention may be inappropriate."). The Winstons have not met their burden of establishing that state procedures were inadequate for the adjudication of their federal claims, in that they had no opportunity to present those claims. See Moore, 442 U.S. at 430 n. 12, 99 S.Ct. at 2381 n. 12.
 
 
 107
 Although the Winstons in their abstention brief have made no claim that they could not present their federal contentions in the Pennsylvania Court of Common Pleas, the majority opinion nevertheless argues that "it is highly unlikely that the plaintiffs' entire challenge encompassed in their federal section 1983 action would have been cognizable in the dependency/custody proceeding that was in progress in the Pennsylvania Court of Common Pleas." (Maj.Op. at 1385-86).
 
 
 108
 The "highly unlikely" characterization adopted by the majority relies on the terms of 42 Pa.C.S.A. § 761(a) which provides that "[t]he Commonwealth Court shall have original jurisdiction of all civil actions or proceedings ... [a]gainst the Commonwealth government, including an officer thereof, acting in his official capacity." Hence, the majority opinion concludes that because the Winstons challenge the DPW regulations, such a challenge would have to be mounted in the Commonwealth Court and could not be asserted in the Court of Common Pleas of Delaware County, which is the court that has been overseeing Samuel Jr.'s custody. Abstention, according to the majority opinion, would not lie, because the very visitation issue which the Winstons desire to litigate could not be litigated in the Court of Common Pleas.
 
 
 109
 This argument, never advanced even by the Winstons, is governed by § 761(b), which although cited in the majority opinion (Maj.Op. at 1386), is never explained. Section 761(b) provides that the jurisdiction of the Commonwealth Court is not exclusive "with respect to actions or proceedings by the Commonwealth government, including any officer thereof, acting in his official capacity, where the jurisdiction of the court shall be concurrent with the several courts of common pleas."
 
 
 110
 It must be remembered that the original action was commenced when CYS, a department of the Commonwealth, filed a Petition for Adjudication of Dependency of Samuel Jr. on July 7, 1989, in the Court of Common Pleas. It was the Winstons who brought the federal action, attacking the constitutionality of various regulations and policies. Therefore, Fawber v. Cohen, 516 Pa. 352, 532 A.2d 429 (1987), cited in the majority opinion at p. 1386, which was an action brought by an individual against the Commonwealth in the Cumberland County Court of Common Pleas, is clearly inapposite.
 
 
 111
 Here, the action that was brought in the Court of Common Pleas was brought by the Commonwealth against the Winstons. Hence, as I have pointed out, § 761(a) has no application, because that section only refers to actions brought against and not by the Commonwealth. Accordingly, § 761(b) is the relevant statute because it would apparently provide for concurrent jurisdiction in the Court of Common Pleas, and nothing appears that would preclude the Winstons from asserting their arguments in the Common Pleas Court. We therefore would not "undermine our precedent" (Maj.Op. at 1386) in ruling on the doctrine of abstention, inasmuch as we know of no authority which could bar abstention where all qualifications for abstention are met including jurisdiction in the state court where all claims may be litigated, particularly where § 761(b) affords concurrent jurisdiction.
 
 D.
 
 112
 The Winstons argue, however, that abstention is inappropriate because their case consists primarily of a challenge to the CYS policy, rather than a broad challenge to a state statute.[9] The considerations to which the Court pointed as counseling abstention when broad-based challenges are made to state statutes, however, are the same considerations that counsel abstention here. See Moore, 442 U.S. at 428-29, 99 S.Ct. at 2379-80.[10]
 
 
 113
 First, the Court pointed to Pullman concerns, i.e., that a federal court should not be forced to interpret state law without the benefit of state court consideration, such that the federal constitutional determination is not binding on the state courts, thus rendering the federal ruling effectively advisory in nature. Id. at 428, 99 S.Ct. at 2379-80. While there is not a weighty Pullman concern at issue here, the Winstons argued in the district court that CYS's policy was in violation of the state regulation, and the state court has not as yet had an opportunity to interpret the regulation.[11] The state court could even interpret it to preclude the agency policy that the Winstons challenge. Any federal ruling as to the federal constitutional or statutory validity of that policy would then have been meaningless.
 
 
 114
 Second, and more important to this case, the Court pointed to the "need for a concrete case or controversy." Id. The Court noted that this concern is usually enhanced by the scope of the challenge. Id. Yet, it is abundantly clear that, in this case, the Winstons cannot point to a present injury-in-fact that would support the need for a federal court to resolve a concrete case or controversy.[12] Quite to the contrary. As I have pointed out, the action brought by the Winstons has been mooted out by Samuel Jr.'s return to his father's custody. See Part I, supra.
 
 
 115
 Third, the court pointed to the concern for allowing state courts to be the principal expositors of state law. Moore, 442 U.S. at 429, 99 S.Ct. at 2380. While it is true that this concern may weigh more heavily when an entire state statutory scheme is at issue, it is not true that it is of no consequence at all when a "mere" regulation or policy is in question. As the state points out, if a statewide regulation or policy is to be interpreted, or especially if it is to be struck down, it is in the interest of comity that a state court rather than a federal court render such a ruling.[13] Thus if the Winstons' action is not deemed moot and their appeal dismissed, as I believe it should be, I would alternatively vacate the district court's order and remand the case to the district court with instructions to that court that it dismiss the Winston case without prejudice on the basis of abstention. See Williams v. Red Bank Board of Ed., 662 F.2d 1008, 1022 (3d Cir.1981).
 
 III
 
 116
 For the reasons that I have stated above in Part I, I believe that the Winstons' action is clearly moot. Thus, I would dismiss their appeal. See Munsingwear, 340 U.S. at 36, 71 S.Ct. at 104.
 
 
 117
 Alternatively, I would vacate the judgment and remand the case with instructions that the district court dismiss the case without prejudice pursuant to the doctrine of abstention. See Williams, 662 F.2d at 1022. Because the majority of the court refuses to dismiss the Winstons' appeal by reason of mootness or to direct the district court to dismiss the action by reason of abstention, I respectfully dissent.
 
 
 
 [1]
 The relevant period is CYS's custody over Samuel, Jr., not, as the dissent suggests, Mr. Winston's custody over Samuel, Jr. See Dissenting op. at 1395, n. 5
 
 
 [2]
 Although we hold infra that there is no reason to remand to the district court for reconsideration of the class action motion, that would not be the case if the Winstons' claim were dismissed as moot. In that instance, the class action could serve to preserve the class challenge to CYS's visitation policy and the DPW regulation
 
 
 [3]
 Although the dissent suggests that there is no exclusivity here because the custody action was begun by CYS, the Winstons' claim challenging the regulation was against the Department of Public Welfare and John F. White, different state agents. The dissent offers no Pennsylvania case in which the parents of a child taken into custody were permitted to raise in the custody proceeding itself a section 1983 challenge comparable to that raised here. The need for this court to determine what may be an undecided issue of Pennsylvania jurisdiction is yet another reason why we should not sua sponte exercise our equitable power to abstain in this now completed action
 
 
 [4]
 Subsection 671(a) lists several other "requisite features" of state child welfare plans on which federal funding is contingent. A state's plan must also:
 (3) provide[ ] that the plan shall be in effect in all political subdivisions of the State ...;
 ....
 (9) provide[ ] that the State agency will--
 (A) report to an appropriate agency or official, known or suspected instances of physical or mental injury, sexual abuse or exploitation, or negligent treatment of a child ...;
 ....
 (10) ... establish[ ] and maintain[ ] standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations ...;
 ....
 (12) provide[ ] for granting an opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness;
 ....
 (16) provide[ ] for the development of a case plan ... for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meet the requirements described in section 675(5)(B)....
 42 U.S.C. § 671(a) (1991).
 
 
 [5]
 In the floor discussion Senator Cranston stated, "These unfortunate children have been cut off from any contact with their families, deprived of the possibility of visitation, and effectively denied the potential for reunification with their families." 125 Cong.Rec. S29,942 (daily ed. Oct. 29, 1979)
 
 
 [6]
 Albeit not dispositive of the "reasonable efforts" issue, a federal-state review team conducted a triennial review in November, 1989, and concluded that the state had complied with all federal standards
 
 
 [7]
 We agree with plaintiffs that the admission of an affidavit by the defendant CYS's employee Carlin Knight, CYS administrator of legal services, which contained a summary of the laws, regulations and policies of eleven states on foster care visitation, was error because the affidavit was inadmissible hearsay. It was a statement offered and used by the court for the truth of the matter asserted, i.e., for the truth of other states' visitation policies, and cannot fairly be characterized as Knight's expert "opinion" of other states' policies. There were no indicia of reliability that the people from whom Knight gathered this information were official or even reliable sources. We conclude, however, that there was sufficient evidence without the affidavit to support the district court's conclusion that the CYS policy does not fall below professional standards. We hold, therefore, that the admission of the hearsay was harmless error
 
 
 [1]
 Since that date, the Court of Common Pleas has awarded legal custody of Samuel to both parents, although he remains solely in his father's physical custody. See In the Interest of: Samuel Winston, unpublished order, J.V. # 21033 (Court of Common Pleas of Delaware County March 12, 1991)
 
 
 [2]
 At least as of October 1990, Maryann Winston's visitation schedule with Samuel was governed by court order. See In the Interest of: Samuel Winston Jr., unpublished order, J.V. # 21033 (Court of Common Pleas of Delaware County October 16, 1990) (setting out the terms of Mr. Winston's required cooperation with CYS):
 H. That he only allow Mrs. Winston visitation with SAMUEL WINSTON, JR. when she is sober and under control and then in a neutral setting. Mr. Winston agrees to the following visitation schedule: 1. While Mrs. Winston is residing at Keystone Center, Mr. Winston will bring the children there every Saturday from 1:00 to 3:00 p.m. 2. While Mrs. Winston is residing at the halfway house or such other treatment center, Mr. Winston shall bring the children there every Saturday from 1:00 to 3:00 p.m. subject to the availability of transportation, being within a reasonable distance, and the regulations of the treating facility. If the visitation does not occur every week and the parties are not able to agree on alternative visitation, then either party may return to Court for a determination of this matter. 3. After two months from this date of October 16, 1990, Mr. Winston will allow Mrs. Winston to visit the children at their home or at a mutually agreeable neutral location which may include parks, restaurants, and malls every Saturday from 1:00 to 3:00 p.m. subject to Mrs. Winston's continued treatment.
 
 
 [3]
 After Samuel Jr. was taken into protective custody in June, 1989, a "right to detain" hearing took place on June 28, 1989, and was followed by another hearing and adjudication of dependency on July 11, 1989. The Winstons filed their federal action on August 23, 1989. Since that time, the state court has held review hearings on October 17, 1989, December 19, 1989, March 21, 1990, October 16, 1990 and March 12, 1991. A hearing had been scheduled for September, 1991, but was continued on court order to October 29, 1991
 
 
 [4]
 Both Judge Sloviter and I agree that the Winstons' injunctive claim is no longer viable in light of Samuel Jr.'s residence with his father. (Maj.Op. at 1384)
 
 
 [5]
 Judge Sloviter, writing for the majority, relies upon Praxis Properties, Inc. v. Colonial Savings Bank, 947 F.2d 49 (3d Cir.1991) and Ameron, Inc. v. United States Army Corps of Engineers, 787 F.2d 875 (3d Cir.1986), in support of her holding that the issue of Samuel Jr.'s custody by CYS is capable of repetition yet will evade review. (Maj.Op. 1383-84). Praxis and Ameron both differ significantly from the circumstances presented here. Both Praxis and Ameron involved 90-day stay periods which had been exceeded and which could not be reviewed within the statutory time limits provided. In Praxis, RTC was entitled to a 90-day stay under 12 U.S.C.A. § 1821(d)(12). In Ameron, the constitutionality of the 90-day automatic stay provision was at issue. Both 90-day stay provisions were held to be too short to ever be fully litigated and appealed. Thus, they were both held to satisfy the "evading review" requirement, just as in Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973), it was held that the "266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete." Here, however, it has been almost two years since Samuel Jr.'s custody was returned to his father, and no event has occurred since that time which would disturb Samuel Sr.'s custody of his son. Hence, the characterization in the majority opinion, that Samuel Jr.'s custody is "temporary" and "evasion of review will ... occur time and time again" (Maj.Op. at 1384) has no basis in fact or evidence, and is postulated only to support the majority's erroneous conclusion that the issue of Samuel Jr.'s custody is not moot
 Moreover, a concern as to whether class certification should or should not have been granted cannot be the reason for a non-mootness determination, as the majority opinion has apparently held, see Maj.Op. at 1384. If an issue is moot, then it is moot regardless of whether other consequences may be deemed to flow from the court's decision. If the district court might hereafter certify a class, such a decision can have no bearing on the present circumstances of Samuel Jr.'s custody, which, as I have discussed in text, is an issue that, at this time, does not present a case or controversy.
 
 
 [6]
 The likelihood of a party completing litigation on such a claim appears especially high if viewed in light of a party's option to make a claim for damages
 
 
 [7]
 The custody proceedings by the Commonwealth against the Winstons are clearly "ongoing" or "pending" for purposes of the Younger doctrine because the Court of Common Pleas of Pennsylvania has retained jurisdiction over the custody of Samuel Jr., see note 3, supra
 Unlike McTeague v. Sosnowski, 617 F.2d 1016, 1020 (3d Cir.1980), where the parties were "in dispute about whether there is a state proceeding pending or whether the Family Court's order was final," the Winstons have not argued that the state court order is final, but merely that the "state case is presently being reviewed only one time every six months, and is, therefore, not 'active' or ongoing." Supplemental Brief of Appellant at 10.
 As I have earlier noted, the state proceeding is ongoing not only in the sense that the Court of Common Pleas is scheduled to review the case on October 29, 1991, but also in the sense that that court is prepared to review Samuel Jr.'s custody before that date at the request of any party. The Winstons' claim that the state proceeding is not ongoing is, therefore, without merit.
 
 
 [8]
 See also United States v. Yazell, 382 U.S. 341, 352, 86 S.Ct. 500, 506-07, 15 L.Ed.2d 404 (1966) (In holding that, in the absence of specific federal legislation, federal interests should not override Texas state coverture rules, the Court noted that: "Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements. They should be over-ridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied."), cited in, Lehman v. Lycoming County Children's Services, 458 U.S. 502, 512, 102 S.Ct. 3231, 3237-38, 73 L.Ed.2d 928 (1982) (declining to extend federal writ of habeas corpus to challenges to state child-custody decisions)
 See also In re Burrus, 136 U.S. 586, 597, 10 S.Ct. 850, 854, 34 L.Ed. 500 (1890) (district court did not have jurisdiction over case concerning family relationships and child custody); Solomon v. Solomon, 516 F.2d 1018, 1024-26 (3d Cir.1975) (District court had no jurisdiction in domestic relations action for nonsupport filed in federal court on basis of diversity because of "domestic relations doctrine," which is that generally, "the federal courts do not have jurisdiction in domestic relations suits," based on "modern view" that "state courts have historically decided these matters and have developed both a well-known expertise in these cases and a strong interest in disposing of them.").
 
 
 [9]
 It is true that the Moore court does indicate that the sweeping nature of a broad challenge to a complex statutory scheme "has traditionally militated in favor of abstention, not against it." Moore, 442 U.S. at 427, 99 S.Ct. at 2379 (emphasis in original). This observation, however, was a comment upon the district court's intimation to the contrary, and cannot be read to mean that abstention is not required where a challenge to a state regulation and policy is made on relatively narrow grounds
 
 
 [10]
 They also argue in passing that abstention is inappropriate because they raise a federal statutory, as well as a constitutional challenge. While Moore does speak of constitutional claims, the Winstons provide no basis for their suggestion that federal statutory challenges are not subject to the analysis of Moore
 
 
 [11]
 See A5 n. 1 and A7 n. 4. While the district court took note of this state law claim, it did not dispose of it in any way
 
 
 [12]
 Samuel Jr. has been returned to the custody of his father, and the Winstons are not currently subject to the CYS policy as to biweekly visitation. See supra § I for discussion of mootness
 
 
 [13]
 While a showing of bad faith or harassment or other sources of "great, immediate, and irreparable harm" may require a federal court to intervene, the Winstons have made no such allegation here. See Moore, 442 U.S. at 432-33, 99 S.Ct. at 2381-82